**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| Chicago Area Joint Welfare Committee for the Pointing, Cleaning and Caulking Industry, Local 52; Tuckpointers Local 52 Pension Plan; Tuckpointers Local 52 Defined Contribution Annuity Trust Fund; and John Kallianis, as Administrative Manager, | ) | Case No. 2:26-mc-00029-AZ<br><br>Hon. Abizer Zanzi |
| Plaintiffs, | ) | |
| v. | ) | |
| Algozine Masonry Restoration, Inc., | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO QUASH THE CITATION AND TERMINATE SUPPLEMENTAL PROCEEDINGS**

Now comes the Defendant and Judgment Debtor, Algozine Masonry Restoration, Inc. ("Algozine"), by counsel, respectfully moves the Court to quash any citation issued in this miscellaneous proceeding and terminate the supplemental proceedings commenced by Chicago Area Joint Welfare Committee For The Pointing, Cleaning And Caulking Industry, Local 52; Tuckpointers Local 52 Pension Plan; Tuckpointers Local 52 Defined Contribution Annuity Trust Fund; And John Kallianis, as Administrative Manager, (Collectively "Local 52") to enforce the July 7, 2016 judgment. 1. In further support, Algozine states as follows.

## INTRODUCTION

Local 52, as the judgment creditors are not attempting to enforce an obligation created by the confirmed plan. They registered and are attempting to collect the Prepetition Judgment even though their claims were expressly classified, treated, settled, released, extinguished, and

discharged under the confirmed plan. Confirmation replaced the pre-petition obligations with the obligations stated in the plan. A later dismissal based on an alleged plan default did not revoke the Confirmation Order, did not revoke Algozine's discharge, and did not revive the Prepetition Judgment. Local 52's remedy, if any, is enforcement of the obligations created by the confirmed plan, not collection of the superseded prepetition judgment.

This supplemental proceeding seeks to collect the wrong obligation. The judgment creditors obtained a judgment against Algozine on July 7, 2016. ("the Prepetition Judgment") Algozine filed its Chapter 11 petition on November 10, 2016. The judgment creditors participated extensively in the Chapter 11 case, filed claims, litigated the priority and amount of those claims, and obtained express treatment under Algozine's Modified Plan of Reorganization. The Bankruptcy Court confirmed the plan on December 15, 2021.

The confirmed plan did not preserve Local 52's right to collect the Prepetition Judgment. The Plan classified claims into categories of priority and unsecured claims for the judgment creditors, prescribed how those claims would be paid, and stated that the plan treatment would constitute full satisfaction, settlement, release, extinguishment, and discharge of the claims. The Confirmation Order bound the parties to that treatment and expressly retained jurisdiction to enforce and interpret the plan.

In April 2026, more than four years after confirmation, the judgment creditors registered the Prepetition Judgment in this District and commenced supplemental collection proceedings. Their position disregards the legal effect of confirmation. Under 11 U.S.C. § 1141 and controlling Seventh Circuit principles, a confirmed plan defines the parties' rights and obligations and supersedes inconsistent prepetition rights. Under directly applicable authority from the Bankruptcy Court for the Northern District of Indiana, post-confirmation dismissal of a Chapter 11 case does

not vacate the confirmation order, revoke the discharge, or revive the original debt. *Matter of Depew*, 115 B.R. 965, 971 to 972 (Bankr. N.D. Ind. 1990).

The judgment creditors rely on the Seventh Circuit's Chapter 12 decision, *Wiese v. Community Bank of Central Wisconsin*, 552 F.3d 584 (7th Cir. 2009). That reliance is misplaced. Wiese involved family farmers who exercised Chapter 12's special and unqualified statutory right to voluntary dismissal under 11 U.S.C. § 1208(b). It addressed whether the bankruptcy court had cause under section 349(b) to preserve negotiated plan concessions after that voluntary dismissal. It did not hold that dismissal automatically vacates every confirmed plan, revokes a Chapter 11 discharge, or revives every prepetition obligation. Indeed, Wiese affirmed the bankruptcy court's authority to preserve rights created by the confirmed plan.

Because the judgment creditors are attempting to use Rule 69 process to collect a prepetition judgment that was replaced by the confirmed plan, the Court should quash the citation and terminate this supplemental proceeding.

## BACKGROUND

### A. The 2016 Judgment and the Chapter 11 Petition

On July 7, 2016, the United States District Court for the Northern District of Illinois entered judgment in favor of the judgment creditors and against Algozine and David Algozine for $566,503.58. The judgment now registered in this Court identifies that date, amount, and originating action. See Exhibit A, Certified Judgment and Registration Materials.

On November 10, 2016, Algozine filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Indiana, under Case No. 16-23208-JRA. The judgment therefore preceded the bankruptcy petition and constituted a prepetition claim. On January 29, 2019, David Algozine received a discharge under Chapter 7 of the Bankruptcy Code. See Exhibit C.

**B. The Plan Expressly Classified and Treated Local 52'sClaims**

Local 52 was not a stranger to the bankruptcy case. The plan specifically identified the Chicago Area Joint Welfare Committee, the Tuckpointers Local 52 Pension Plan, and the Tuckpointers Local 52 Defined Contribution Annuity Trust Fund. It also addressed the parties' Seventh Circuit appeal regarding the priority treatment of the Funds' claims. See Exhibit B, § 2.3. The plan treated Local 52's priority claims in Classes 7, 8, and 9. It also treated Local 52's unsecured claims in Classes 15, 16, and 17. See Exhibit B, Article V.

The unsecured claims were substantial. The plan listed approximately $233,682.94 for the Welfare Committee, $177,512.19 for the Pension Plan, and $103,352.43 for the Annuity Trust Fund. Each class was to receive its pro rata share of the Unsecured Dividend in full satisfaction, settlement, release, and discharge of its unsecured claim.

On the initial Distribution Date, this Local 52 was to receive, in full satisfaction, settlement, and release and discharge of its unsecured claim, a pro rata share of the Unsecured Dividend, or 10% of the allowed claims. See Exhibit B, Article 2.46.

The Plan also provided in articles 10.2- 10.3, "Discharge" provides in part:

**10.2 Discharge of Interests.**
Except as provided for in the Plan, all Holders of Interests shall be precluded from asserting against the Reorganized Debtor, or its assets, on account of such Interests, any further right, title or Interest based on any act, omission, transaction or activity of any kind or nature that occurred before the Effective Date, whether or not such holder filed a proof of Interest in Case.

**10.3 Injunction.**
As of the Effective Date, all entities that have held, currently hold or may hold a claim against the Debtor are permanently enjoined from taking any of the following actions on account of any such claim against the Reorganized Debtor except as provided in the Plan or the Confirmation Order: (i) commencing or continuing in any manner any actions or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or Order; (iii) creating, perfecting or enforcing any lien or encumbrance; and (iv) asserting a setoff, right of subrogation or recoupment of any kind against any Debt, liability or obligation.

See Exhibit B, Article 10.

### C. The Bankruptcy Court Confirmed the Plan

On December 15, 2021, the Bankruptcy Court entered its Order Confirming Chapter 11 Plan. See Exhibit D, Order Confirming Chapter 11 Plan. The order found that notice of the confirmation hearing had been served on all creditors and parties in interest. The order stated that the plan, as modified, satisfied the applicable requirements of Title 11 and ordered that the plan was confirmed.

### D. The Judgment Creditors Sought and Obtained Dismissal Based on Alleged Plan Defaults

In August 2023, the judgment creditors moved in the Bankruptcy Court to dismiss the Chapter 11 case. The Bankruptcy Court later dismissed the case on November 13, 2023. The judgment creditors' request for dismissal based on an alleged default under the plan confirms that they understood the plan to govern the parties' post-confirmation rights. Their alleged injury was nonpayment of plan obligations. That alleged default did not revert those plan obligations to the Prepetition Judgment. See Exhibit E.

### E. The Judgment Creditors Registered the Prepetition Judgment and Commenced Collection in 2026

On April 14, 2026, Local 52 had the Clerk of the Northern District of Illinois certify the July 7, 2016 judgment for registration in another district. Local 52 then registered it in this Court under Case No. 2:26-mc-00029-AZ. See Exhibit A. Local 52 did not seek to sue under the plan but instead sought to enforce a discharged judgment, registered the Prepetition Judgment, and invoked supplemental process to collect it. That is the defect requiring termination of these proceedings.

## ARGUMENT

### I. THE COURT SHOULD TERMINATE THE RULE 69 PROCEEDING BECAUSE THE CONFIRMED PLAN REPLACED THE PREPETITION JUDGMENT WITH THE OBLIGATIONS CREATED BY THE PLAN

Federal Rule of Civil Procedure 69 provides a mechanism for enforcing an existing judgment. It does not enlarge the substantive rights embodied in that judgment, nor does it permit a creditor to enforce an obligation superseded by a confirmed Chapter 11 plan. Rule 69 process must yield to the binding effect Congress assigned to confirmation under 11 U.S.C. § 1141.

Section 1141(a) provides that the terms of a confirmed plan bind the debtor and every creditor, whether or not the creditor accepted the plan. The Seventh Circuit likewise recognizes that a confirmed plan serves as the governing agreement between the debtor and creditors, defining their post confirmation rights and obligations. *Ernst & Young LLP v. Baker O'Neal Holdings*, *Inc.,* 304 F.3d 753, 755–756 (7th Cir. 2002). A creditor that participates in confirmation cannot preserve an inconsistent prepetition right by remaining silent when the plan provides different treatment. Id. at 756–758.

The Seventh Circuit has also held that plan confirmation can supersede inconsistent rights created by a prepetition agreement. In *Ernst & Young*, a prepetition arbitration provision could not be enforced because the confirmed plan provided for adjudication in the bankruptcy court. *Id* at 304 F.3d at 755–758. The court explained that the plan set forth the parties' rights and obligations and superseded the inconsistent prepetition arbitration right.

The same reasoning applies with greater force here. Local 52's original right to collect the 2016 judgment was converted into the priority and unsecured treatment expressly stated in the confirmed plan. The plan is not ambiguous on this point. It separately classified Local 52' priority and unsecured claims. The plan specified their amounts and payment treatment. It provided that

the treatment constituted full satisfaction, settlement, release, extinguishment, and discharge. Local 52 may dispute whether Algozine fulfilled those plan obligations, but they cannot disregard the plan and collect the Prepetition Judgment as though confirmation never occurred.

The proper post-confirmation claim is therefore a claim to enforce the plan obligation. It is not a right to execute on the prepetition judgment. Because the registered judgment is not the operative post-confirmation obligation, this Rule 69 proceeding should be terminated.

## II. UNDER NORTHERN DISTRICT OF INDIANA AUTHORITY, POST CONFIRMATION DISMISSAL DID NOT VACATE THE CONFIRMATION ORDER OR REVIVE THE PREPETITION JUDGMENT

Local 52 contends that dismissal returned the parties to their prepetition positions and revived the full 2016 judgment. That position conflicts with *Matter of Depew*, 115 B.R. 965 (Bankr. N.D. Ind. 1990), the most directly applicable authority. In *Depew*, creditors obtained dismissal of a Chapter 11 case after confirmation because the debtors materially defaulted on plan payments. One creditor then argued that section 349(b) vacated the confirmation order and restored the original prepetition obligation. The court rejected that argument. It held that confirmation discharged the prepetition obligations and replaced them with the obligations stated in the plan. *Id.* at 966. It further held that the creditor's remedy after default was to enforce the confirmed plan and that there was no right to claim more than the plan provided. *Id.* at 971 - 972.

The court's reasoning controls the central issue presented here. Section 349(b) identifies particular orders and transfers that dismissal affects. An order confirming a Chapter 11 plan under §1129 is not among them. *Id.* at 969. Reading section 349(b) as silently vacating confirmation would also circumvent section 1144, which establishes the exclusive and narrowly limited procedure for revoking a confirmation order. *Id.* at 970 to 971. Revocation must be sought within

180 days and requires proof that confirmation was procured by fraud. 11 U.S.C. § 1144; *In re Longardner & Associates, Inc.*, 855 F.2d 455, 460 to 462 (7th Cir. 1988).

No timely revocation occurred here. The Confirmation Order was entered on December 15, 2021. In 2023, the judgment creditors sought dismissal based on alleged nonpayment, not revocation for fraud. Their 2026 collection effort cannot indirectly accomplish what section 1144 no longer permits directly.

Moreover, *Depew* explains why a default does not revive the debt. Confirmation is the final judgment in a Chapter 11 reorganization. It permits the reorganized debtor and later creditors to rely on a defined post-confirmation capital structure. The Court held that if every plan default restored every original debt, confirmation would not provide the finality required for reorganization. 115 B.R. at 970–971. Thus, the creditor may enforce what it received under the plan, but "there is no right to claim anything more." *In re Depew,* 115 B.R. 965, 974 (Bankr. N.D. Ind. 1990).

That is precisely what the judgment creditors are doing. They allege that Algozine did not satisfy the plan payments. Even if that allegation is accepted for purposes of this Motion, their remedy is a proceeding to enforce the plan treatment. It is not execution on the full pre-petition judgment.

## III. LOCAL 52'S RELIANCE ON THE CHAPTER 12 DECISIONS IN WIESE AND WEBER DOES NOT AUTHORIZE COLLECTION OF THE ORIGINAL CHAPTER 11 DEBT

Local 52 relies on Chapter 12 authority to argue that dismissal eliminated the plan's binding effect. Those cases do not support the requested collection.

### A. Wiese Addressed Chapter 12's Unique Voluntary Dismissal Right and Affirmed Preservation of Plan Rights for Cause

*Wiese v. Community Bank of Central Wisconsin, 552 F.3d 584 (7th Cir. 2009),* arose under Chapter 12, which Congress enacted for family farmers. The Chapter 12 debtors had an express, unwaivable right to voluntary dismissal under section 1208(b). Shortly after confirmation of a negotiated plan, they sought dismissal after receiving concessions from their secured lender. The bankruptcy court found cause under section 349(b) to preserve the plan rights the lender acquired in reliance on confirmation.

The Seventh Circuit affirmed the bankruptcy court. It did not hold that dismissal automatically extinguishes every confirmed plan. It held that section 349(b) expressly permits a court, for cause, to alter dismissal's ordinary consequences to protect rights acquired in reliance on the bankruptcy. *Id* at 552 F.3d at 590 to 592. The decision therefore confirms the significance of reliance on a confirmed plan rather than creating a categorical rule reviving prepetition obligations.

The statutory context is materially different here. Algozine is a corporate Chapter 11 debtor, not a family farmer exercising Chapter 12's unqualified right to voluntary dismissal. The judgment creditors themselves sought dismissal based on an alleged material default. A Section 1112(b) dismissal for plan default does not carry the Chapter 12 concern that a debtor's plan obligations could impermissibly waive section 1208(b)'s absolute dismissal right.

Local 52's reading of *Wiese* also overlooks the decision's limited scope. The Seventh Circuit expressly addressed the bankruptcy court's discretionary cause determination only to the extent that section 349(b) affected rights obtained under the confirmed plan. *Id* at at 589. It did not hold that section 349(b) invariably vacates confirmation or revives discharged Chapter 11 debts. Applying *Wiese* as a categorical revival rule would extend it beyond both its facts and its holding.

Finally, Local 52's interpretation conflicts with *Depew*, which directly addresses post-confirmation dismissal under Chapter 11 in this District. *Depew* holds that dismissal does not vacate the confirmation order and does not revive the original debt. The more specific Chapter 11 authority should govern this Chapter 11 dispute.

**B. Weber Concerns Interpretation of a Chapter 12 Plan, Not Revival of a Prepetition Debt After Chapter 11 Dismissal**

*Matter of Weber*, 25 F.3d 413 (7th Cir. 1994), does not address the effect of dismissal at all. It involved the interpretation of a confirmed Chapter 12 plan and whether annual farm income had to be distributed to unsecured creditors. The court deferred to the bankruptcy court's interpretation of its own Confirmation Order because the issuing court is in the best position to construe its own order. *Id.* at 416 to 417.

That principle favors Algozine. The Confirmation Order expressly retained jurisdiction to enforce and interpret the plan. If any genuine ambiguity exists concerning the Funds' treatment or the effect of dismissal, the proper course is to stay this supplemental proceeding and permit the Bankruptcy Court to interpret its own order. *Weber* does not authorize this Court to treat the Prepetition Judgment as revived.

**IV. SECTION 349 AND JEVIC DO NOT RESTORE A PREPETITION JUDGMENT THAT WAS REPLACED BY A CONFIRMED CHAPTER 11 PLAN**

Local 52 also relies on section 349(b)(3) and *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017). These cases do not establish that a post-confirmation dismissal vacates a Chapter 11 confirmation order. Section 349(b)(3) addresses the revesting of property of the estate. It does not state that dismissal vacates an order confirming a plan under section 1129, revokes a discharge under section 1141(d), or restores every prepetition claim. Congress specifically identified the

orders and transfers affected by dismissal. A confirmation order is not included. *Depew*, 115 B.R. at 968- 970.

The *Jevic* case concerned a structured dismissal entered without confirmation that distributed estate property in violation of the Bankruptcy Code's ordinary priority rules. That case did not involve a confirmed plan, a corporate discharge upon confirmation, section 1144's limits on revocation, or a creditor's effort to revive the Prepetition Judgment years after confirmation. Its general description of dismissal as restoring the pre-petition status quo cannot override the specific statutory consequences of confirmation or convert section 349 into an unstated method for revoking confirmation.

Local 52 would make section 1144 largely meaningless. A creditor that failed to seek revocation within 180 days and could not prove fraud could obtain the same result merely by seeking dismissal based on default. *Depew* rejected that exact result because it would evade the carefully limited revocation procedure Congress enacted. *Matter of Depew,* 115 B.R. at 970 to 971.

**V. THE CONFIRMATION ORDER AND PLAN PRECLUDE USE OF THE PREPETITION JUDGMENT AS THE BASIS FOR A NEW CITATION**

Local 52's present enforcement theory cannot be reconciled with their conduct in the bankruptcy case. They received notice, filed and litigated claims, participated in confirmation, obtained express treatment, and later moved to dismiss based on alleged nonperformance of that treatment.

A creditor cannot simultaneously assert that the plan created payment obligations sufficient to support dismissal for material default and that the same plan had no effect on its right to collect the Prepetition Judgment. The rights are inconsistent. Confirmation replaced the pre-petition debt

with the plan obligation. Alleged nonpayment may create a claim for breach or enforcement of the plan, but it does not resurrect the extinguished prepetition claim.

The Confirmation Order is also a final order entitled to preclusive effect.

Of course, a confirmed Chapter 11 plan is not by any stretch of the imagination a contract. It is true that courts have often made this analogy in dicta for the sake of convenience when they were actually making the point that plan *interpretation* is governed by contract law principles, thesame way as statutes or other court orders are. But nobody calls a statute, or a court order a contract. For instance, in *Ernst & Young, LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 755 (7th Cir. 2002), the Court said: "A confirmed plan of reorganization is in effect a contract between the partiesand the terms of the plan describe their rights and obligations." As another example of such dicta,the Seventh Circuit later emphasized the exact same context as follows: *"Principles of contract lawapply to interpreting a plan of reorganization*: *FCC v. Airadigm Commc 'ns, Inc*. (In re Airadigm Commc 'ns, Inc.), 616 F.3d 642, 664 (7th Cir. 2010)."A confirmed plan of reorganization is in effect a contract between the parties and the terms of the plan describe their rights and obligations." [emphasis added; citing *to Ernst & Young*.]

Indeed, the Seventh Circuit's actual holding is that a confirmed plan *is a judgment*, *not a contract*. In *In re Heartland Steel, Inc.*, 389 F.3d 741 (7th Cir. 2004), the Seventh Circuit compared its language in Ernst & Young with that in *In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000) where it had analogized a confirmed plan not to a contract but to a consent decree, noting that it had preclusive effect, unlike a private contract. The Seventh Circuit concluded that a confirmed plan is a judgment: "When a court enters the confirmation order, however, it is passing judgment on the plan itself, giving effect to every provision of that plan and, in essence, incorporating by referencethe entirety of the plan into the judgment." *Id.* at 744. This makes sense not only because

of the analogyto a consent decree and the binding language of 11 U.S.C. § 1141 in particular, but also in contextwith other Bankruptcy Code provisions. For instance, under 11 U.S.C. § 1126(f), creditors who arenot impaired by a plan are presumed to have accepted it, unlike the consent required in private contract formation. And 11 U.S.C. § 1129(b) goes even further and allows a court to impose treatment under a plan on non-consenting creditors—a concept far removed from contract formation.And no matter what creditors consent to, a plan cannot be implemented and is not binding on anyoneuntil the bankruptcy court enters an order confirming it. 11 U.S.C. § 1141. In any event, the choiceof tools to be used in deciding this matter is not a reason for the Court to decline to hear it.

Thus, once an order is entered confirming a plan, it becomes a final, binding order with res judicata effect as to all issues and claims arising thereunder. The Funds did more than receive notice. They actively participated and obtained detailed treatment of the same prepetition obligations now asserted in this proceeding.

Permitting collection of the Prepetition Judgment would give the Funds more than the confirmed plan allowed and would place them ahead of similarly classified creditors. The plan required pro rata treatment of the Funds' unsecured claims through the Unsecured Dividend. A separate Rule 69 execution would defeat that treatment and undermine the equality among creditors established at confirmation.

## VI. THIS COURT HAS AUTHORITY TO QUASH ITS OWN PROCESS AND TERMINATE A SUPPLEMENTAL PROCEEDING THAT SEEKS TO ENFORCE A SUPERSEDED OBLIGATION

Rule 69 establishes a procedure for executing a valid and enforceable judgment. It does not require the Court to continue process based on an obligation that federal bankruptcy law has

replaced. This Court retains authority to control its own supplemental proceedings, quash improper process, and prevent use of its procedures to circumvent a final bankruptcy order.

The Seventh Circuit recognizes that a court in which collection litigation is pending may determine the scope and effect of a bankruptcy injunction for purposes of the matter before it. *Matter of Hendrix*, 986 F.2d 195, 198 to 199 (7th Cir. 1993). The issuing bankruptcy court remains the principal forum for contempt or enforcement of its own discharge order, but that allocation does not prevent this Court from stopping supplemental process that is inconsistent with the confirmed plan. Regarding jurisdiction, even though the Bankruptcy Court retained jurisdiction to hear various kinds of matters post-confirmation. In *Elscint, Inc. v. First Wisconsin Financial Corp.* (*In re Xonics, Inc.),* 813 F.2d 127, 131 (7th Cir. 1987), the Court rejected the contention that a bankruptcy court's continuing power to interpret its own orders gave it jurisdiction over a state law contract dispute between creditors. *Xonics*, 813 F.2d at 130.

Termination is appropriate because the defect is substantive. The judgment creditors have chosen the Prepetition Judgment as the obligation to enforce. Under section 1141 and *Depew*, that obligation was replaced by the confirmed plan. The creditors have not obtained a judgment adjudicating a default under the plan or fixing damages arising from that default. Until they do so in an appropriate forum, they cannot use Rule 69 to collect the full pre-petition judgment.

## VII. THE CITATION ALSO SEEKS TO COLLECT A DISCHARGED CORPORATE OBLIGATION

Algozine is a corporation, not an individual Chapter 11 debtor. In a corporate Chapter 11 case, confirmation ordinarily discharges the debtor from debts arising before confirmation except as otherwise provided in the plan, the Confirmation Order, or section 1141(d). The plan here expressly provided that its treatment would satisfy, settle, release, extinguish, and discharge the claims at issue.

*Depew* holds that a post-confirmation Chapter 11 dismissal does not revoke the discharge that accompanied confirmation. 115 B.R. at 967 to 972. Revocation of confirmation and the related discharge is governed by section 1144, not accomplished automatically by dismissal. No order revoking confirmation has been identified.

If the discharge remains effective, use of a citation to collect the Prepetition Judgment as Algozine's liability also conflicts with 11 U.S.C. § 524(a).

## CONCLUSION

Local 52 as the Local 52's claims arose before Algozine filed its Chapter 11 petition. Those claims were expressly classified and treated by the confirmed plan. The Confirmation Order bound the parties to that treatment. Under section 1141 and *Matter of Depew*, confirmation replaced the original prepetition obligations with the obligations created by the plan, and post-confirmation dismissal did not revive the Prepetition Judgment.

Algozine respectfully requests that the Court:

1. Quash any citation issued in this miscellaneous proceeding;
2. Terminate the supplemental proceedings directed against Algozine and any citation respondent;
3. Prohibit further enforcement of the July 7, 2016 judgment against Algozine through this miscellaneous proceeding;
4. Grant such other relief as the Court deems just.

Respectfully submitted,

Algozine Masonry Restoration, Inc.

By: /s/ O. Allan Fridman
One of Its Attorneys

O. Allan Fridman
555 Skokie Boulevard, Suite 500
Northbrook, Illinois 60062
Telephone: (847) 412-0788 allan@fridlg.com

**PROPOSED EXHIBIT LIST**

**Exhibit A:** Certified Judgment, request for registration, and affidavit filed in Case No. 2:26-mc-00029-AZ

**Exhibit B:** Algozine Masonry Restoration, Inc.'s Modified Plan of Reorganization dated July 16, 2021

**Exhibit C:** Discharge order David Algozine dated January 29, 2019.

**Exhibit D:** Order Confirming Chapter 11 Plan entered December 15, 2021, in *In re Algozine Masonry Restoration, Inc.*, Case No. 16-23208-JRA

**Exhibit E:** November 13, 2023 order dismissing the Chapter 11 case

**Exhibit A:** Certified Judgment, request for registration, and affidavit filed in Case No. 2:26-mc-00029-AZ

AO 451 (Rev. 12/12) Clerk's Certification of a Judgment to be Registered in Another District

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

-FILED-
APR 17 2026
At ______ M
Chanda J. Berta, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

Chicago Area Joint Welfare Committee
*Plaintiff*
v.
Tuckpointers Local 52 Pension Plan
*Defendant*

Civil Action No. 1:14-cv-05953

## CLERK'S CERTIFICATION OF A JUDGMENT TO BE REGISTERED IN ANOTHER DISTRICT

I certify that the attached judgment is a copy of a judgment entered by this court on *(date)* 07/07/2016 .

I also certify that, as appears from this court's records, no motion listed in Fed. R. App. P. 4(a)(4)(A) is pending before this court, the time for appeal has expired, and no appeal has been filed or, if one was filed, it is no longer pending.

Date: 04/14/2026

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

# *United States District Court*

***Northern District of Illinois***
***Eastern Division***

I, Thomas G. Bruton, Clerk of the United States District Court for the Northern District of Illinois, do hereby attest and certify that the annexed documents(s) is (are) a full, true, and correct copy of the original(s) on file in my office and in my legal custody.

**IN TESTIMONY WHEREOF:**

I have hereunto subscribed my name and affixed the seal of the foresaid court at Chicago, Illinois, on 4/14/2026.

THOMAS G. BRUTON, CLERK

By: ______________________
Deputy Clerk

ILND 450 (Rev. 10/13) Judgment in a Civil Action

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

Chicago Area Joint Welfare Committee for the Pointing, Cleaning and Caulking Industry, Local 52 et al ,

Plaintiff(s),

v.

Algozine Masonry Restoration, Inc.,

Defendant(s).

Case No. 14 C 5953
Judge Gary Feinerman

**JUDGMENT IN A CIVIL CASE**

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $ ,

which ☐ includes pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐ in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☒ other: Judgment is entered in favor of Plaintiff Chicago Area Joint Welfare Committee for the Pointing, Cleaning and Caulking Industry, Local 52, et al., and against Defendant Algozine Masonry Restoration, Inc. and David Algozine, in the amount of $566,503.58.

---

This action was *(check one)*:

☐ tried by a jury with Judge presiding, and the jury has rendered a verdict.
☐ tried by Judge without a jury and the above decision was reached.
☒ decided by Judge Gary Feinerman on a motion.

Date: 7/7/2016

Thomas G. Bruton, Clerk of Court

/s/ Jackie Deanes , Deputy Clerk

**Exhibit B:** Algozine Masonry Restoration, Inc.'s Modified Plan of Reorganization dated July 16, 2021

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| Algozine Masonry Restoration, Inc. | ) | Case No. 16-23208- |
| | ) | |
| Debtor. | ) | |

# DEBTOR'S MODIFIED PLAN OF REORGANIZATION

**DATED JULY 16, 2021**

By:/s/ O. Allan Fridman
Attorney for the Plan Proponent

O. Allan Fridman
555 Skokie Blvd.
Suite 500
Northbrook, Illinois 60062
847-412-0788
allan@fridlg.com

PURSUANT TO § 1125 OF TITLE 11 OF THE UNITED STATES CODE, NOTHING CONTAINED IN THIS PLAN OF REORGANIZATION (THE "**PLAN**") SHOULD BE CONSTRUED AS CONSTITUTING A SOLICITATION OF ACCEPTANCES OF THE PLAN UNTIL SUCH TIME AS THE DISCLOSURE STATEMENT (AS DEFINED HEREIN) HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION, AND DISTRIBUTED, WITH APPROPRIATE BALLOTS, TO ALL HOLDERS OF IMPAIRED Claims AGAINST AND IMPAIRED INTERESTS IN THE DEBTOR ENTITLED TO VOTE ON THE PLAN. THE DEBTOR RESERVE THE RIGHT TO FILE A FURTHER AMENDED OR A FURTHER AMENDED AND RESTATED PLAN AND A FURTHER AMENDED OR FURTHER AMENDED AND RESTATED DISCLOSURE STATEMENT FROM TIME TO TIME HEREAFTER. REFERENCE IS MADE TO SUCH DISCLOSURE STATEMENT FOR A DISCUSSION OF VOTING INSTRUCTIONS, THE DEBTOR'S HISTORY, BUSINESS, PROPERTY, AND RESULTS OF OPERATIONS; A SUMMARY OF SIGNIFICANT EVENTS WHICH HAVE OCCURRED TO DATE IN THE BANKRUPTCY CASES; AND THE MEANS OF IMPLEMENTING AND FUNDING THE PLAN. ALL HOLDERS OF Claims AGAINST AND INTERESTS IN THE DEBTOR ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## INTRODUCTION

The Debtor Algozine Masonry Restoration, Inc. ("Algozine" or the "Debtor") proposes the following plan of reorganization (the "**Plan**") and the resolution of the outstanding Claims against and Interests in the Debtor pursuant to the provisions of Chapter 11 of the Bankruptcy Code, and requests Confirmation of the Plan pursuant to § 1129 of the Bankruptcy Code. Capitalized terms used herein shall have the meanings ascribed to such terms in Article 2 of the Plan.

Algozine is engaging in several cost cutting measures, including selling the property owned by Algozine Property LLC (APL) thereby reducing the Debtor monthly costs by renting a smaller building at lower rental rate and cutting administrative staff and salaries. Algozine is currently bidding on several large construction restoration projects and has been awarded substantial contracts. With the addition of these projects, Algozine is confident it will be able to pay its creditors according to this Plan.

## ARTICLE I
## CONSTRUCTION

1.1 Where not inconsistent or in conflict with the provisions of the Plan, the words and phrases used herein shall have the meaning ascribed thereto in the Bankruptcy Code and Rules.

1.2 Section captions used in the Plan are for convenience only and shall not affect the construction of the Plan. The first letters of terms defined in the Plan are capitalized.

## ARTICLE II
## DEFINITIONS

For this Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to the singular and the plural forms of the terms defined, unless the context otherwise requires):

2.1 "**Administrative Claim**" or "**Administrative Expense Claim"** means any right to payment constituting a cost or expense of administration of this Bankruptcy Case under Sections 503(b) and 507(a)(1) including, without limitation, (a) any actual, necessary costs and expenses of preserving the bankruptcy Estate, (b) any indebtedness or obligations incurred or assumed by the Debtor in the ordinary course of business during the course of this Bankruptcy Case, (c) any Professional Fees and Expenses, whether fixed before or after the Effective Date, (d) any fees or charges assessed against the bankruptcy Estate under section 1930, Chapter 123, title 28, United States Code.

2.2 "**Allowed**" means, with reference to any claim (including any Administrative Expense Claim), (a) any claim against the Debtor, proof of which was filed within the applicable period of limitation fixed by the Bankruptcy Court in accordance with Rule 3003(c)(3) of the Bankruptcy Rules (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules,

or a Final Order, (ii) as to which no timely objection has been interposed based upon 11 U.S.C. § 502(d), (iii) as to which an objection had been interposed, to the extent such claim has been Allowed (whether in whole or in part) by a Final Order, and (iv) which is not listed as disputed, unliquidated or contingent on the Debtor's schedules, (b) if no proof of such claim was filed timely or was withdrawn, any claim against the Debtor which is listed by the Debtor in its schedules, as such schedules may be amended from time to time in accordance with Rule 1009 of the Bankruptcy Rules, as liquidated in amount and not contingent, (c) any claim arising from the recovery of property under Sections 550 or 553 of the Bankruptcy Code and Allowed in accordance with section 502(b) of the Bankruptcy Code, (d) any claim Allowed under or pursuant to the terms of this Plan, or (e) any claim that has been Allowed by a Final Order.

2.3 “**Appeal Escrow”** The Debtor is currently engaged in an Appeal pending in the United States Court of Appeals for the Seventh Circuit titled *Algozine Masonry Restoration Inc. v Local 52 Chicago Area Joint Welfare Committee for the Pointing Cleaning and Caulking Industry(“Welfare Fund”), Tuckpointers Local 52 Defined Contribution Annuity Trust Fund (“Annuity Fund”), Tuckpointers Local 52 Pension Plan* (“*Pension Fund*”) (Collectively referred to as “Tuckpointers’ Funds”), Case No. 20-3384. The Appeal stems from the Debtor’s objection to the Tuckpointers’ Funds’ Claims and the application of 11 U.S.C. § 507(a)(4) and (5). On the Effective Date the Debtor shall pay the following amounts: (1) $2,171.24 to the Welfare Fund; (2) $1,962.00 to the Pension Fund; and (3) $1,423.10 to the Annuity Fund and shall pay $25,700.00 to Administrative District Council 1 of Illinois of the International Union of Bricklayers and Allied Craftworkers Fringe Benefit Funds (“Bricklayer Funds”), to represent the amounts undisputedly entitled to priority treatment under 11 U.S.C. § 507(a)(5). On the Effective Date the Debtor shall further deposit $62,883.42 into an Interest-bearing escrow account. Should the Debtor’s Appeal fail, the Debtor shall distribute the following amounts: (1) $19,163.06 to the Welfare Fund; (2) $16,491.40 to the Pension Fund; and (3) $10,184.06 to the Annuity Fund; and (4) $17,044.90 to the Bricklayer Funds, and any Interest that has accrued in the escrow account shall be distributed among those same funds pro-rata. Should the Debtor’s Appeal be successful the balance in the escrow account, including any Interest that has accrued, will be paid to Class 27 creditors pro-rata in addition to the payments to those creditors through the Unsecured Dividend. This treatment is meant to comply with 11 U.S.C. § 1129 (a)(9).

2.4 "**Bankruptcy Code**" means title 11 of the United States Code, as amended, in effect and applicable to the Debtor's Bankruptcy Case.

2.5 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Indiana, Hammond Division, having jurisdiction over this case and the matters reserved in this Plan.

2.6 **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure prescribed by the Supreme Court of the United States and modified from time to time pursuant to 28 U.S.C.§ 2075.

2.7 **"Bar Date"** means the last day for filing proofs of claim against the Debtor as fixed by Order of the Court as March 9, 2017 and May 9, 2017 for Governmental entities.

2.8 **"Business Day"** means any day on which banks are open to carry on their ordinary commercial banking business in Chicago, Illinois.

2.9 **"Case"** means the Chapter 11 case of Algozine Masonry Restoration, Inc., filed on November 10, 2016.

2.10 "**Cash**" means legal tender of the United States, including amounts on deposit at financial institutions in checking accounts, money market accounts and the like.

2.11 "**Cause of Action**" or "**Causes of Action**" means all Claims, rights, actions, suits, causes of action, Liens, judgments and damages belonging to the Debtor or its bankruptcy Estate and any and all liabilities, obligations and debts owing to the Debtor or its bankruptcy Estate, in each case whether known or unknown, in law, equity or otherwise, including, but not limited to, those causes of actions under Sections 544, 548, 549, 550 and 553 of the Bankruptcy Code.

2.12 "**Claim**" means: (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

2.13 **"Claimant"** means the holder of a claim against the Debtor or the Estate.

2.14 **"Classs"** means a grouping of substantially similar Claims or Interests as designated in Article V of the Plan.

2.15 **"Confirmation**" means the process undertaken by the Bankruptcy Court in accordance with section 1129 of the Bankruptcy Code to confirm a plan.

2.16 "**Confirmation Date**" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

2.17 "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan, or any amendment or modification thereto, pursuant to section 1129 of the Bankruptcy Code, and any findings of fact or conclusions of law contained in the Confirmation Order or a separate document entered contemporaneously therewith.

2.18 "**Cure Claim**" means any Claim resulting from the Debtor's obligation to cure defaults in connection with the assumption under Section 365 of the Bankruptcy Code of an executory contract or unexpired lease under the Plan.

2.19 **"Consummation**" means completion of all Distributions to be made under the Plan.

2.20 **"Creditors"** means all entities with Claims against the Debtor or the Estate.

2.21 **"Debt"** means liability on a Claim.

2.22 **"Debtor"** means Algozine Masonry Restoration Inc.

2.23 **"Disbursing Agent"** means the Reorganized Debtor's President David Algozine, or such Entity as may be appointed or designated to fulfill these duties.

2.24 "**Disclosure Statement**" means the document and all exhibits, annexed thereto (together with any letters of recommendation or solicitation approved by the Bankruptcy Court) filed in connection with the Debtor's case pursuant to section 1125 of the Bankruptcy Code, and approved by the Bankruptcy Court as containing adequate information as that term is defined in section 1125(a)(1) of the Bankruptcy Code, as may be amended or modified from time to time by any duly authorized amendment or modification.

2.25 **"Disputed Claim"** means any claim (other than an Allowed Claim) (a) which is either a claim which has been scheduled by the Debtor, or (b) a claim which is the subject of a Proof of Claim which has been filed with the Bankruptcy Court, as to which scheduled claim the Debtor has indicated a dispute, or as to which scheduled or filed claim a timely objection to the allowance thereof has been filed by a party entitled to make such an objection, but as to which the Bankruptcy Court has not yet entered a Final Order.

2.26 **"Distribution(s)"** means the property (including payments) required by the Plan to be provided to the Holders of Allowed Claims.

2.27 **"Effective Date"** means the first Business Day occurring on the sixth month after the Confirmation Date; provided, however, that if a stay of the Confirmation Order is in effect on such first Business Day, then the Effective Date shall be the first Business Day thereafter on which, if the Confirmation Order has not been vacated, and no stay of the Confirmation Order is in effect.

2.28 **"Estate"** means the bankruptcy Estate created upon commencement of the Case pursuant to Section 541(a) of the Code.

2.29 **"Equity Interest"** shall refer to the outstanding stock of the Debtor held by David Algozine in the amount 50% and Joseph Algozine in the amount 50.

2.30 **"Fee Application"** means an application of a Professional under section 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in this case.

2.31 "**Final Order**" means an order or judgment of the Bankruptcy Court, as to which the time to Appeal, petition for certiorari, or move for re-argument or rehearing has expired and as to which no Appeal, petition for certiorari or other proceedings for re-argument or rehearing shall then be pending, provided, however, if an Appeal, or writ of certiorari, re-argument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied or re-

argument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further Appeal, petition for certiorari or move for re-argument or rehearing shall have expired; provided, further, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules, may be filed with respect to such Order shall not cause such Order not to be a Final Order.

2.32 "**General Unsecured Claims**" means a Claim or Claims that is/are not an Administrative Expense Claim, Secured Claim, Priority Claim.

2.33 **"Initial Distribution Date"** means a date that is not less than thirty (30) days after the Effective Date.

2.34 **"Impaired"** shall have the meaning provided in Section 1124 of the Code.

2.35 **"Lien"** has the meaning provided by Section 101(37) of the Code.

2.36 **"Order of Confirmation"** means the order of the Court confirming the Plan pursuant to Section 1129 of the Code.

2.37 **"Petition Date"** means the date on which the Debtor filed its Chapter 11 petition with the Clerk of the Court, November 10, 2016.

2.38 **"Plan"** means this Plan of Reorganization of the Debtor pursuant to Chapter 11 of the United States Bankruptcy Code, any exhibits annexed hereto and any documents delivered in connection herewith, as the same may be amended or modified from time to time by any duly authorized amendment or modification.

2.39 **"Priority Claim"** means any claim entitled to priority treatment pursuant to section 507(a) of the Code, except for Administrative Claims and fees payable under 28 U.S.C. § 1930.

2.39 "**Professional**" means a person retained to be compensated pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

2.41 "**Professional Fees and Expenses**" means the fees and expenses incurred by a Professional rendering services for the Debtor and its Estate, which fees and expenses are eligible for compensation and/or reimbursement under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

2.42 **"Property of the Estate"** has the meaning provided by Section 541 of the Code.

2.43 **"Pro-Rata"** means proportionately so that the ratio of the amount of the Distribution made because a particular Allowed Claim to the Distributions made on account of all Allowed Claims of the Class in which the particular Allowed Claim is included is the same as the ratio of the amount of such particular Allowed Claim to the total amount of Allowed Claims of the Class of which such particular Allowed Claim is included.

2.44 **"Reorganized Debtor"** means the Debtor following (1) entry of the Confirmation Order and (2) the occurrence of the Effective Date.

2.45 **"Unclaimed Property"** means any Distributions which are unclaimed ninety (90) days following the date of distribution. Unclaimed Property shall include (a) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (b) funds for checks that have not been paid, (c) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of the proper address with which to mail or deliver such property, and (d) Interest on cash constituting Unclaimed Property.

2.46 **"Unsecured Dividend"** means unsecured claim of all Classes will be paid beginning on July 31, 2021, and on each subsequent January 31 and July 31 ending on January 31, 2026, a total of ten percent of the Allowed amount of their Claims, in equal semiannual installments, for a total of 10 payments. This Class may receive its stream payments sooner depending on the outcome of the Appeal as defined in the Appeal Escrow in section 2.3. This treatment of all Classes of Unsecured claim is described herein as the "Unsecured Dividend.

## ARTICLE III
## CERTAIN GENERAL TERMS AND CONDITIONS

The following general terms and conditions apply to this Plan:

3.1 To the extent any claim or portion of any Claim of a Creditor is a Disputed Claim, or is otherwise contingent or unliquidated, or has not been Allowed by the Court, the Disbursing Agent may either reserve and segregate such distribution under the Plan as is sufficient to provide for each of such Claims under the Plan, ask the Court to determine an appropriate reserve, or ask the Court to estimate for purposes of allowance any contingent or unliquidated claim which would otherwise delay the administration of the Case.

3.2 Pursuant to section 1123 of the Code, Article V of the Plan designates eleven Classes of Claims and Equity Interest. As set forth below, Administrative Claims of the kind specified in Sections 507(a)(1) of the Code, have not been classified and are excluded from the Classes set forth in Article V of the Plan, in accordance with section 1123(a)(1) of the Code. A claim shall be deemed classified in a Class only to the extent that the claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of the claim qualifies within the description of such different Class. A claim is in a particular Class only to the extent that the claim is an Allowed Claim or an Allowed Secured claim in that Class. Multiple proofs of claim filed by a Creditor, which qualify for inclusion within the same Class shall be aggregated and, if Allowed, shall constitute a single Allowed Claim.

## ARTICLE IV
## ADMINISTRATIVE EXPENSES AND UNCLASSIFIED Claims

4.1 The Holders of Administrative Claims entitled to priority under section 507(a)(1) of the Code, and entities entitled to payments under section 546(c) or 553 of the Code, and entities entitled to payment of Administrative Expense Claims pursuant to section 503 and 507(a) of the

Code shall receive on account of such Administrative Claims or Administrative Expense Claims, cash in the amount of such Administrative Claims or Administrative Expenses Claims on or before the Effective Date of the Plan or as soon thereafter as is practicable.

4.2 Notwithstanding the foregoing, Professionals employed at the expense of the Estate, and any entities which may be entitled to an allowance of fees and expenses from the Estate pursuant to Sections 503(b)(2) through (6) of the Code, shall receive cash in the amount awarded to such Professionals and entities as soon as practicable after an Order is entered by the Court approving such award pursuant to Sections 330 or 503(b)(2) through (6) of the Code, unless any such Professional or other entity consents prior to Confirmation to other treatment.

4.3 Unclassified Claims. In accordance with § 1123(a)(l), Administrative Claims and Priority Tax Claims, as described in this Article IV, have not been classified and are unimpaired under the Plan. The treatment of and consideration to be received by Holders of Allowed Claims or Allowed Interests pursuant to this Article II and this Plan shall be in full satisfaction, settlement, release, extinguishment and discharge of their respective Claims against or Interests in the Debtor and the Estate, except as otherwise provided in this Plan or the Confirmation Order.

## ARTICLE V
## DESIGNATION AND TREATMENT OF Classes OF CLAIMS AND Equity Interests

For purposes of all Confirmation issues, including, without limitation, voting, Confirmation and distribution, except as otherwise provided herein, all Claims and Equity Interest in the Debtors (except for Administrative Claims and Administrative Expense Claims) are classified in the following chart:

| Class Name | Amount (Approx.) | Proposed Treatment | Vote |
|---|---|---|---|
| Class 1 Administrative and Expense Claims | $70,000.00 | Paid in full in cash on the Effective Date. | No |
| Class 2 Secured claim of Byline Bank | $80,000.57 (secured value) $1,081,127.58 total pre-petition loan. | Impaired. The Allowed Claim is a secured by the Small Business Administration on a 15-year term expiring in 2029 will be reinstated and paid according the terms of the note. | Yes |
| Class 3 Secured Claim of Snap Financial | $116,939.00 | Impaired. The Allowed Claim is a secured by the assets of the Debtor the claim will be paid in full up to the secured value.. | Yes |

| | | | |
|---|---|---|---|
| Class 4 Priority Claims of Internal Revenue Service | $216,317.09 | Unimpaired. The Allowed Claim to be paid in accordance with 1129(a)(9)(D) in equal monthly installments over a period of 60 months from the Petition Date. | No |
| Class 5 Priority Tax Claims Indiana Department of Revenue | $45,935.68 | Unimpaired. The Allowed Claim to be paid in accordance with 1129(a)(9)(D) in equal monthly installments over a period of 60 months from the Petition Date. | No |
| Class 6 Priority Tax Claims Lake County Treasurer Office | $3,555.84 | Unimpaired. The Allowed Claim to be paid in accordance with 1129(a)(9)(D) in equal monthly installments over a period of 60 months from the Petition Date. | No |
| Class 7 Priority Tuckpointers Local 52 Pension Plan | $56,057.90<br><br>Proof of Claim Subject to claim objection | Unimpaired. Paid in full in cash on the Effective Date. | No |
| Class 8 Priority Tuckpointers Local 52 Annuity Trust Fund | $34,621.36<br><br>Proof of Claim Subject to claim objection | Unimpaired. Paid in full in cash on the Effective Date. | No |
| Class 9 Priority Claims Chicago Area Joint Welfare Committee, Local 52 | $65,658.83<br><br>Proof of Claim Subject to claim objection | Unimpaired. Paid in full in cash on the Effective Date. | No |
| Class 10 Priority Admin. Dist. Council 1 of Ill. of the Int'l Union | $42,744.90<br><br>Proof of Claim Subject to claim objection | Unimpaired. Paid in full in cash on the Effective Date. | No |
| Class 11 Unsecured Admin. Dist. Council 1 of Ill. of the Int'l Union | $25,946.15 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |

| | | | |
|---|---|---|---|
| Class 12 Unsecured Illinois Department of Employment | $15,428 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 13 Unsecured Tax Claims Indiana Department of Revenue | $ 4,361.37 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 14 Unsecured Claim of Snap Financial | $137,000 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 15 Unsecured Chicago Area Joint Welfare Committee, Local 52 | $233,682.94 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 16 Tuckpointers Local 52 Pension Plan | $177,512.19 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | |
| Class 17 Unsecured Tuckpointers Local 52 Defined Contribution Annuity Trust Fund | $103,352.43 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | |

| | | | |
|---|---|---|---|
| Class 18 Unsecured Claim of Platinum Rapid Funding Group | $164,821.32 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 19 Unsecured Claim Bank De Leon | $72,500.00 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 20 Unsecured claim Arch Capital | $62,950.00 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 21 Unsecured Bricklayers Local No. 6 of Indiana Welfare Fund | $14,972.67 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 22 Bricklayers Local No. 6 of Indiana Pension Fund | $19,221.44 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 23 Unsecured claim of the Bricklayers and Trowel Trades | $3,482.23 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend | Yes |

| | | | |
|---|---|---|---|
| Class 24 Unsecured Claim of the Bricklayers Union Local 4 of IN/KY | $6,337.45 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 25 Unsecured International Masonry Institute | $981.57 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 26 Unsecured claim Local 21 Brick Layers | $20,567.00 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 27 Unsecured claim of Glico Scaffolding Co., LLC | $122,117.21 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 28 Unsecured Claim of the Internal Revenue Service | $81,389.64 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share of the Unsecured Dividend. | Yes |
| Class 29 Convenience Class | $5,000 (estimated) | Unimpaired. On the initial Distribution Date, this class shall be paid in full. | No |
| Class 30 General Unsecured Claims | $573,974.69 | Impaired. On the initial Distribution Date, this class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata receive, in full satisfaction, settlement and release and discharge of its unsecured claim pro-rata share | Yes |

| | | | |
|---|---|---|---|
| | | of the Unsecured Dividend. | |
| Class 31 Equity Interest | $10,000 | Impaired. Debtor shall cancel all its shares on Reorganized Debtor David Algozine and Joseph Algozine shall pay the sum of $10,000 for his Equity Interest in the Reorganized Debtor. | Yes |

**5.1 Class 1: Administrative Claims.**

All debts incurred during the Bankruptcy Case, but as unpaid, will be paid in full upon the Effective Date or as otherwise agreed upon by the Creditor. These include the Claims of: (i) the Debtor's attorneys and accountants and the U.S. Trustee's Fees and (ii) debts incurred by the Debtor after the commencement of its Bankruptcy Case in the ordinary course of its business. The exact amount of these Claims is not known now; however, for purposes of this Disclosure Statement they have been estimated at $40,000.

**5.2 Class 2: Secured claim of Byline Bank**

5.2.1 Class 2 Consist of the Claims of Byline Bank as successor in Interest of Ridgestone as a Small Business Administration loan. The Debtor is a Co-Debtor along with “APL” on the loan with a face amount of $1,150,000 on a 15-year term loan at the rate of 6.25% a.p.r that will mature in September 2029. The loan was secured by the real property owned by APL located at 2000 North Lafayette Court, Griffith, IN 43619 along with all the assets of the Debtor including: Equipment, figures, inventory, accounts, instrument, chattel paper and receivables pursuant to a Security Agreement and a UCC financing Statement. Byline filed a Proof of Claim stating a secured balance of $208,951.57 and an unsecured balance of $872,176.01.

The Building owned by APL was sold and the net proceeds of $798,192.69 were paid by APL on the Byline Loan. After applying this payment Byline Claims that the balance of the loan is $279,939.44 The Loan was also secured by the home of Joe Algozine the Debtor’s former president, which was sold and the proceeds were applied to Byline claim. Therefore, Byline will be paid an Allowed Class 2 Claim of $80,000.

5.2.2 In full satisfaction, settlement, release, and discharge of and in exchange for each the Allowed Claim shall receive and/or retain:

A. Its lien on the property owned by the Debtor, with the same validity, enforceability, perfection and priority as it had on the Petition Date and as may have been acquired during this Chapter 11 case pursuant to Orders entered by the Bankruptcy Court, until the Allowed Secured Class 2 Claims are paid in full; and,

B. Payment of the Allowed Class 2 Claim, shall be paid in equal monthly payments over, as described:

The Byline Bank Allowed Claim consists of the principal balance of $80,000 Byline Bank agrees that post-petition Interest shall be recalculated at shall be recalculated at 5.25% per the terms below

The Debtor shall continue to make adequate protection payments to Byline Bank pursuant to the terms of the cash collateral orders entered in this Case until such time as the Plan payments commence.

The Byline Bank Allowed Secured claim shall be paid with Interest at 5.25 % payable monthly over the balance of the SBA loan with 9 years from the Effective Date of the Plan and as follows:

(i) Commencing on the 15th day after the Effective Date, the Debtor shall pay Byline Bank on the 15th day of each month for a period of 34 months the sum of $2,537.41 per month, to be applied to accruing and outstanding Interest with any excess toward the principal balance.

(ii) On the Maturity Date, Byline Bank shall receive a balloon payment equal to the principal, Interest, fees and costs outstanding as of that date (the "Balloon Payment").

(iii) Upon payment in full of its Allowed Claim, Byline Bank shall release its lien on the Property.

The gross amount of the payments listed in in this section along with the balloon payment on the Maturity Date, shall be equal to the full amount of the Byline Bank's Allowed Claim. Based on a discount rate of 5.25%, the present value of the foregoing payments shall equal the secured portion of the Byline Bank Allowed Claim. This satisfies the requirements of section 1129(b)(2)(A)(i)(II) which provides in pertinent part that "(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the Allowed amount of such claim, of a value, as of the Effective Date of the Plan, of at least the value of such holder's Interest in the Estate's Interest in such property …" 11 U.S.C. § 1129(b)(2)(A)(i)(II).

The terms of the Byline Bank Loan Documents shall survive confirmation of the Plan and shall govern, with the exception that the terms of payment (including Interest rate, Maturity Date and amortization schedule) shall be modified by the terms of the Plan as confirmed.

The following shall constitute an Event of Default on the Debtor's obligations to Byline Bank with respect to its Allowed Class 2 Claim ("Class 2 Event of Default"): (i) failure to make any of the required payments above; (ii) failure to maintain proper insurance on the Property; (iii) further encumbrance of the Property without notice to Byline Bank and prior written approval by Byline Bank; and (iv) failure to provide financial reporting to Byline Bank as reasonably required by Byline Bank or as required by the Byline Bank Loan Documents. Upon written notice of an Event of Default, the Debtor or the Reorganized Debtor, as the case may be, shall have fourteen (14) days to cure the Class 2 Event of Default ("Cure Period"). In the event that the Debtor fails to cure a Class 2 Event of Default within the Cure Period, Byline Bank shall be entitled to exercise its Lien rights against the Property without further Order of this Court. The Plan injunction shall be modified to allow Byline Bank to exercise its rights under the Byline Bank Loan Documents.

5.2.3. Protection:

5.2.3.1. Retention of Liens: During the full term of the Plan and until Byline's Allowed Secured Claim is paid in full, Byline shall retain its lien(s) on the Byline Collateral, with the same validity, enforceability, perfection and priority as it had on the Petition Date and as may have been acquired during this Chapter 11 case pursuant to Orders entered by the Bankruptcy Court.

5.2.3.2. No Transfer of Byline Collateral: During the full term of the Plan and until Byline's Allowed Secured Claim is paid in full pursuant to the terms hereof, the Byline Collateral may not be transferred, sold, or refinanced, unless Byline's Allowed Secured Claim is paid in full or Byline provide written consent. Byline's Allowed Secured Claim may be prepaid pursuant to the terms of the Byline Loan Documents (as that term is defined below).

5.2.3.3. Reaffirmation and Amendment of Byline Loan Documents: In all other respects, the rights and obligations of the Debtor and Byline under their loan documents concerning the Debt that underlies Byline's Allowed Secured Claim shall remain the same and shall govern, including, but not limited to, the security Interest of Byline in certain assets of the Debtor. On or before the Effective Date, the Debtor and Byline shall enter in to an amendment of their loan documents incorporating the terms set forth herein (collectively with any and all other loan documents related to the Debt that underlies in Byline's Allowed Secured Claim, "Byline Loan Documents") The terms of the Byline Loan Documents shall survive confirmation of the Plan and shall govern the rights and remedies of the parties thereto.

5.4. Events of Default: The following shall constitute an Event of Default on the Debtor's obligations to Byline with respect to Byline's Allowed Secured Claim ("Class 2 Event of Default"):

(i) Failure to make any of the required payments above;
(ii) Failure to maintain proper insurance on Algozine Masonry Restoration Property for the Byline Collateral;
(iii) Further encumbrance of the Byline Collateral without notice to Byline and prior written approval by Byline;
(iv) Failure to provide financial reporting to Byline as reasonably required by Byline or as required under the Byline Loan Documents; and/or
(v) Debtor's failure to abide by any of the terms, conditions, obligations, and/or requirements set forth in the Byline Loan Documents.

5.4.1. Upon written notice of an Event of Default from Byline, the Debtor and/or the Reorganized Debtor, as the case may be, shall have fourteen (14) days to cure the Class 2 Event of Default ("Cure Period").

5.4.2. In the event that the Debtor fails to cure a Class 2 Event of Default within

the Cure Period, Byline shall be entitled to exercise its rights under the Byline Loan Documents without further Order of this Court. The Plan injunction shall be modified to Byline to exercise its rights under the Byline Loan Documents.

5.2.4 The Allowed Class 2 Claim Is impaired and entitled to vote on the Plan.

**5.3 Class 3: Secured Claims of Snap Financial**

5.3.1 Class 3 is the Secured Claim of Snap Financial has filed a Proof of Claim number 6, with a secured amount of $259,939 secured by a blanket lien of the Debtors assets. After paying Class 2 Secured claim there will be $116,969 for an Allowed secured amount for this Class.

5.3.2 The Allowed amount of the Class 3 claim shall be $116,969. or as established by order of the Bankruptcy Court. The Allowed Secured Claim of Snap Financial shall be settled, compromised, and satisfied by execution on the Effective Date. Class 3 is impaired under the Plan.

5.3.3 Class 3 shall receive on account of its Allowed Class 3 Claim the following:

i. Snap will receive a stream of monthly payments by the Debtor in the amounts set forth on the attached Exhibit 1 (listed under the monthly payments column under Proposed Interest Schedule) to be paid at the "TILL RATE" fixed market rate of Interest of five percent (4.75%) per annum as follows: (1) 120 equal monthly payments, paying principal and Interest calculated based on a 120 month amortization commencing on 30 days after the Effective Date and continuing on the fifteenth day of each consecutive month thereafter, or the first business day thereafter if such date falls on a weekend or holiday listed in Bankruptcy Rule 9006, for 120 months, specifically $1,226.39 and (2) one balloon payment of all outstanding principal and Interest payable of $1,226.39 on the first day of the 60th month after the Effective Date or the first business day thereafter if such date falls on a weekend or holiday listed in Bankruptcy Rule 9006;

ii. The monthly payments shall commence 30 days after the Effective Date of the Plan and continue thereafter for a period of five years per Exhibit 1 below:

Exhibit 1

| Years | Interest Rate | Rate | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|
| 1–10 | 4.75% | Effective Date | $1,226.39 | 30th day after Effective Date | 120 |

payment of any amounts still due and owing on the Allowed Secured claim of is due on the 10th anniversary of the 30th day after the Effective Date.

iii. On the ten (10) year anniversary of the Effective Date of the Plan, Snap Financial will be paid a balloon payment in the amount set forth on Exhibit 1, less any payments made pursuant to Sections sub section (i) above; and

iv. The gross amount of the payments listed in subsection (i) shall be $147,166.80 Assuming no other payments are made pursuant to these subsections, a balloon payment of $1,226.39 shall be paid on the tenth anniversary of the Effective Date, and with that payment, total payments $147,166.80 the full amount of the Allowed Class 3 Claim. Based on a discount rate of 4.75%, the present value of the foregoing payments shall equal the secured portion of the Allowed Class 3 Claim, $116,939.00 This satisfies the requirements of section 1129(b)(2)(A)(i)(II) which provides in pertinent part that "(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the Allowed amount of such claim, of a value, as of the Effective Date of the Plan, of at least the value of such holder's Interest in the Estate's Interest in such property …" 11 U.S.C. § 1129(b)(2)(A)(i)(II).

5.3.4 The following shall constitute an Event of Default on the Debtor's obligations to Snap Financial with respect to its Allowed Class 8 Claim ("Class 8 Event of Default"): (i) failure to make any of the required payments above; (ii) further encumbrance of the property without notice to Home State; failure to pay real Estate taxes or maintain property insurance and (iv) Upon written notice of an Event of Default, the Debtor or the Reorganized Debtor, as the case may be, shall have thirty (30) days to cure the Class 8 Event of Default ("Cure Period"). In the event that the Debtor fails to cure a Class 8 Event of Default within the Cure Period, Snap Financial shall be entitled to exercise its Lien rights against the Property.

5.3.5 Waiver of default. Snap Financial shall waive any pre- or post-petition default by the Debtor, through the Effective Date.

5.3.6 Retention of Liens. Snap Financial retain any valid, non- avoidable Liens with the priority accorded thereto under applicable state or federal law. "with the same validity, enforceability perfection and priority as it had on the Petition Date until the full claim balance plus Interest required by the Plan and any post-filing costs and fees are paid in full. In the event that the property is sold or refinanced prior to the 120-month repayment period, then Snap Financial shall receive its full claim balance plus accrued Interest, fees and costs in full at closing. Snap Financial shall also be permitted to credit bid its Allowed Claim plus accrued Interest, fees and costs at any such sale."

5.3.7 The Allowed Class 3 Claim is impaired and entitled to vote on the Plan.

**5.4 Class 4: Priority Claims of Internal Revenue Service.**

5.4.1 On the Effective Date the Internal Revenue Service (IRS) will receive a payment of the administrative claim in the approximate amount of $72,585.46. This amount is computed as of November 18, 2020. The amount of the administrative claim will be determined as of the date of the Effective Date with statutory Interest and fees.

5.4.2 The IRS filed a Proof of Claim stating a priority claim against the Debtor in the amount of $225,049.67. The payments will commence on the Effective Date and will be paid in full as follows one payment of $100,000 and the balance in in equal monthly installments starting and finishing no later than 48 months from the Effective Date, with statutory Interest of 4% paid at $3,409.67 per month, unless the holder thereof agrees to a different treatment. This treatment of Allowed Tax Claims is intended to comply with the requirements of section 1129(a)(9)(D) of the Bankruptcy Code.

5.4.3 In full satisfaction, settlement, release, and discharge of and in exchange for each Class 4 Allowed Tax claim, The IRS shall receive and/or retain:

A. Its statutory lien on the property owned by the Debtor, with the same validity, enforceability, perfection and priority as it had on the Petition Date and as may have been acquired during this Chapter 11; and,

B. Payment of the entire unpaid balance of the Allowed Claim, including any accrued statutory Interest, shall be paid in equal monthly payments over 60-month period from the Petition Date, as described:

i. The IRS will receive a stream of monthly payments by the Debtor in the amounts set forth to be paid at a fixed statutory rate of Interest of four percent (4%) per annum in the amount of $151,019.09 of $3,409.67[1] in 48 monthly payments, paying principal and Interest commencing on the Initial Distribution Date and continuing on the 25th day of each consecutive month thereafter, or the first business day thereafter if such date falls on a weekend or holiday listed in Bankruptcy Rule 9006, for the remainder of the 60 months from the Petition Date.

ii. The Total Allowed Claim will be paid within the balance of time from the 60 Month period beginning on the Petition Date as provided pursuant to 1129(a)(9)(D). Should the Confirmation Date or Effective Date be continued or extended the payment schedule listed above will be adjusted so that the entire Allowed Claim plus Interest is paid in full by November 10, 2021.

5.4.3 Event of Default

A. Should the Debtor fail to timely submit a plan payment, quarterly payment or properly executed Employer's Quarterly Federal Tax Return (Form 941) to the United States of America, IRS, as required per this Order, the Plan shall be deemed in default without further recourse to United States Bankruptcy Court relief after each step of the following procedure is performed:

i. Upon the failure of the Debtor to timely submit a plan payment, a quarterly payment as stated, the Service shall notify the attorney for the Debtor in writing of the Debtor's failure;

---

[1] The payments must be completed within 60 months of the Petition Date pursuant to 11 USS 1129, this estimate is based on a 48-month payment schedule based on an estimated distribution date. Should payments begin later then this period will decrease causing payments to increase.

ii. The Debtor shall have 30 days from the mailing of the notification described in the preceding subparagraph to cure in full the failure to fulfill a requirement(s) of this Order; and

iii. The only allowable defense to the default as described herein shall be proof that the Debtor cured all unperformed requirements listed in the notification prior to the end of the 30-day period listed in the preceding subparagraph.

A. Cure of Default

i) That upon the failure of the debtor to make any payment due on a secured or priority tax claim, or failure to file the necessary tax returns and make adequate deposits, which is not cured within thirty (30) days of the mailing of a written notice of default by the creditor, such creditor may exercise all rights and remedies available under non-bankruptcy laws for the collection of its entire claim and/or seek appropriate relief from this Court.

ii) In the event the court orders a conversion of this case to a Chapter 7 proceeding, all property of the debtor, debtor-in-possession or Reorganized Debtor, including property which will revest in the Reorganized Debtor pursuant to confirmation of the plan of reorganization and all property acquired by the Reorganized Debtor after a plan of confirmation, shall be property of the Chapter 7 Estate.

5.4.4 The Class is unimpaired and is not entitled to vote.

**5.5 Class 5: Priority Claims of the Indiana Department of Revenue.**

5.5.1 The Class consists of the Priority claim of the Indiana Department of Revenue ("IDOR") The Allowed Tax Claims, in the amount of $50,297.00 will be paid in full in equal monthly installments starting with the Initial Distribution Date and finishing no later than 60 months from the Petition Date with Allowed statutory Interest of 4% paid at $926.30 per month[2]. The payments will commence on the Effective Date and continue for 60 months from the Petition Date with statutory Interest until the Claims are paid in full, unless the holder thereof agrees to a different treatment. This treatment of Allowed Tax Claims is intended to comply with the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.

5.5.2 IDOR shall retain its statutory lien on the property owned by the Debtor, with the same validity, enforceability, perfection and priority as it had on the Petition Date and as may have been acquired during this Chapter 11 case pursuant to Orders entered by the Bankruptcy Court, until the Allowed Class Claims are paid in full; and,

5.5.3 The Class is unimpaired and is not entitled to vote.

---

[2] The payments must be completed within 60 months of the Petition Date pursuant to 11 USS 1129, this estimate is based on a 18-month payment schedule based on an estimated distribution date. Should payments begin later then this period will decrease causing payments to increase.

**5.6 Class 6: Priority Tax Claims Lake County Treasurer Office**

5.6.1 The Class consists of the Priority claim of the Lake County Treasurer ("Treasurer") The Allowed Tax Claims, in the amount of $3,555.84 will be paid in full in equal monthly installments starting with the Initial Distribution Date and finishing no later than 60 months from the Petition Date with Allowed statutory Interest of 4% paid at $203.86 per month[3]. The payments will commence on the Effective Date and continue for 60 months from the Petition Date with statutory Interest until the Claims are paid in full, unless the holder thereof agrees to a different treatment. This treatment of Allowed Tax Claims is intended to comply with the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.

5.6.2 The Treasurer shall retain its statutory lien on the property owned by the Debtor, with the same validity, enforceability, perfection and priority as it had on the Petition Date and as may have been acquired during this Chapter 11 case pursuant to Orders entered by the Bankruptcy Court, until the Allowed Class 6 Claims are paid in full; and,

5.6.3 The Class is unimpaired and is not entitled to vote.

**5.7 Class 7: Priority Claims the Priority Tuckpointers Local 52 Pension Plan.**

5.7.1 The Class consists of the priority Claims of the Priority Tuckpointers Local 52 Pension Plan ("Local 52") and consists of the Allowed priority Claims for contributions to an employee benefit plan for actual hours worked by employees in the 180 days before the Petition Date pursuant to 11 USC 507 (a)(4) and (5). Each Holder of an Allowed Union Priority Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of such claim the amount of the Allowed priority claim on the Effective Date.

5.7.2 The Class Claimant filed a Proof of claim alleging a $56,057.90 as a priority amount of its claim. The Debtor disputed this amount and filed an objection to the priority portion of this Proof of Claim. The objection was based on actual hours worked during the 180-day period and payments made pre-petition being applied to older invoices. A resolution of the claim objection will determine the amounts due for the priority portion of this claim. The Bankruptcy Court denied the objection and the Debtor took an Appeal pending in the Northern District of Indiana. The Claim is subject to an Appeal described in section 2.3 above.

5.7.3 The Class is unimpaired and is not entitled to vote.

**5.8 Class 8: Priority Tuckpointers Local 52 Annuity Trust Fund**

5.8.1 The Class consists of the priority Claims of the Laborers' Pension/Health/ Welfare Funds and consists of the Allowed priority Claims for contributions to an employee benefit plan for actual hours worked by employees in the 180 days before the Petition Date pursuant to 11 USC 507 (a)(4) and (5). Each Holder of an Allowed Union Priority Claim shall receive, in full

[3] The payments must be completed within 60 months of the Petition Date pursuant to 11 USS 1129, this estimate is based on a 18 month payment schedule based on an estimated distribution date. Should payments begin later then this period will decrease causing payments to increase.

satisfaction, settlement, release, extinguishment and discharge of such claim the amount of the Allowed priority claim on the Effective Date.

5.8.2 The Class Claimant filed a Proof of Claim showing $34,621.36 as a priority amount. The Debtor disputed this amount and filed an objection to the priority portion of this Proof of Claim. The objection was based on actual hours worked during the 180-day period and payments made pre-petition being applied to older invoices. A resolution of the claim objection will determine the amounts due for the priority portion of this claim. The Bankruptcy Court denied the objection and the Debtor took an Appeal pending in the Northern District of Indiana. The Claim is subject to an Appeal described in section 2.3 above.

5.8.3 The Class is unimpaired and is not entitled to vote.

**5.9 Class 9: Priority Claims Chicago Area Joint Welfare Committee, Local 52.**

5.9.1 The Class consists of the priority Claims of the Laborers' Pension/Health/ Welfare Funds and consists of the Allowed priority Claims for contributions to an employee benefit plan for actual hours worked by employees in the 180 days before the Petition Date pursuant to 11 USC 507 (a)(4) and (5). Each Holder of an Allowed Union Priority Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of such claim the amount of the Allowed priority claim on the Effective Date.

5.9.2 The Class Claimant filed a Proof of Claim showing $65,658.83 as a priority amount. The Debtor disputed this amount and filed an objection to the priority portion of this Proof of Claim. The objection was based on actual hours worked during the 180-day period and payments made pre-petition being applied to older invoices. A resolution of the claim objection will determine the amounts due for the priority portion of this claim. The Bankruptcy Court denied the objection and the Debtor took an Appeal pending in the Northern District of Indiana. The Claim is subject to an Appeal described in section 2.3 above.

5.9.3 The Class is unimpaired and is not entitled to vote

**5.10 Class 10: Priority Admin. Dist. Council 1 of Ill. of the Int'l Union**

5.10.1 The Class consists of the priority Claims of the Admin. Dist. Council 1 of Ill. of the Int'l Union and consists of the Allowed priority Claims for contributions to an employee benefit plan for actual hours worked by employees in the 180 days before the Petition Date pursuant to 11 USC 507 (a)(4) and (5). Each Holder of an Allowed Union Priority Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of such claim the amount of the Allowed priority claim on the Effective Date.

5.10.2 The Class Claimant filed a Proof of Claim showing $42,744.90 as a priority amount. The Debtor disputes this amount and will be filing an objection to the priority portion of this Proof of Claim. The Debtor filed an objection and an agreed Order was entered changing the claim to $25,700.00. The Class then filed a motion to re-calculate its claim based on the Bankruptcy Court ruling on the Local 52 Objection that motion is on hold pending a resolution on the Appeal. The

Claim is subject to an Appeal described in section 2.3 above.

5.10.3 The Class is unimpaired and is not entitled to vote

**5.11 Class 11: Unsecured Admin. Dist. Council 1 of Ill. of the Int'l Union**

5.11.1 On the Initial Distribution Date, the Admin. Dist. Council 1 of Ill. of the Int'l Union shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata shares of the Unsecured Dividend. The class filed a Proof of Claim showing an unsecured amount of $25,946.15

5.11.2 The Class is impaired and is entitled to vote.

**5.12 Class 12 Unsecured Illinois Department of Employment Security**

5.12.1 The Class consists claimants consists of the unsecured claim Illinois Department of Employment Security ("IDES") claim approximate $15,428 as scheduled by the Debtor. The Claimant had not filed Proof of Claim.

5.12.2 On the Initial Distribution Date, the IDES shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata share of the Unsecured Dividend.

5.12.3 The Class is impaired and is entitled to vote**.**

**5.13 Class 13 Unsecured Tax Claims Indiana Department of Revenue**

5.13.1 The IDOR filed a Proof of Claim stating an unsecured balance of $4,361.37. On the Initial Distribution Date, the Unsecured Tax Claims Indiana Department of Revenue ("IDOR).

5.13.2 On the Initial Distribution Date, the IDOR shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata share of the Unsecured Dividend.

5.13.3 The Class is impaired and is entitled to vote.

**5.14 Class 14 Unsecured Claim of Snap Financial**

5.14.1 This class consists of the Unsecured claim of Snap ("Snap.") Snap filed a Proof of Claim alleging that it has a secured claim of $253,939.00. Class 3 will be paid as the secured value of $116,969, the balance of the loan will be paid as unsecured in the amount of $137,000. Snap is the holder of a junior UCC security agreement. Pending a determination of the value of the Debtor's Property by the Court, Snap will have an unsecured claim of $137,00.00.

5.14.2 On the Initial Distribution Date, the Class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata shares of the Unsecured

Dividend.

5.14.3 The Allowed Claim Is Impaired and is entitled to vote on the Plan.

**5.15 Class 15 Unsecured Chicago Area Joint Welfare Committee, Local 52**

5.15.1 On the Initial Distribution Date, the Unsecured Claim Chicago Area of Joint Welfare Committee, Local 52 shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata share of the Unsecured Dividend as described in Class 29. The class filed a Proof of Claim number 19 showing an unsecured amount of $233,682.94.

5.15.2 The Class is impaired and is entitled to vote.

**Class 16 Unsecured Tuckpointers Local 52 Pension Plan**

5.16.1 On the Initial Distribution Date, the Unsecured Claim Tuckpointers Local 52 Pension Plan shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata share of the Unsecured Dividend as described in Class 29. The class filed a Proof of Claim number 20 showing an unsecured amount of $177,512.19

5.16.2 The Class is impaired and is entitled to vote.

**Class 17 Unsecured Tuckpointers Local 52 Defined Contribution Annuity Trust Fund**

5.17.1 On the Initial Distribution Date, the Unsecured Claim Tuckpointers Local 52 Defined Contribution Annuity Trust Fund shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata share of the Unsecured Dividend as described in Class 29. The class filed a Proof of Claim number 21 showing an unsecured amount of $103,352.43.

5.17.2 The Class is impaired and is entitled to vote.

**5.18 Class 18 Unsecured claim of Platinum Rapid Funding Group**

5.18.1 The class consists of the Unsecured claim of Platinum Rapid Funding Group ("Platinum.") Platinum filed a Proof of Claim alleging that it has a secured claim of $164,821.32. The Debtor's Assets are fully encumbered by Byline Bank as shown in Class 2 and 3. Platinum's claim is subordinate to and will be treated as unsecured for purpose of the plan provided the Property is valued according the Debtor's valuation. Platinum will have an unsecured claim of $164,821.32

5.18.2 On the Initial Distribution Date, the Class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata shares of the Unsecured Dividend.

5.18.3 The Allowed Claim Is Impaired and is entitled to vote on the Plan.

**5.19 Class 19 Unsecured claim Bank De Leon**

5.19.1 The class consists of the Unsecured claim of Bank De Leon ("BDL.") BDL has not yet filed a Proof of Claim the Debt was scheduled by the Debtor as $72,500. The Debtor has objection to this claim and will be filing a Valuation Motion pursuant to § 506. BDL is the holder of a junior UCC security agreement. The Debtor's Assets are fully encumbered by as shown in Classes 2 and 3. BDL claim is subordinate to Byline Bank and will be treated as unsecured for purpose of the plan provided the Property is valued according the Debtor's valuation. BDL will have an unsecured claim of $72,500.00.

5.19.2 On the Initial Distribution Date, the Class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata shares of the Unsecured Dividend.

5.19.3 The Allowed Claim Is Impaired and is entitled to vote on the Plan

**5.20 Class 20 Unsecured claim Arch Capital**

5.20.1 The class consists of the Unsecured claim of Arch Capital ("Arch.") Arch has not yet filed a Proof of Claim the Debt was scheduled by the Debtor as $62,950. Arch is the holder of a junior UCC security agreement. The Debtor's Assets are fully encumbered as shown in Class 2 and 3. Arch's claim is subordinate to Byline Bank and will be treated as unsecured for purpose of the plan provided the Property is valued according the Debtor's valuation. Pending a determination of the value of the Debtor's Property by the Court, Arch will have an unsecured claim of $62,950.00.

5.20.2 On the Initial Distribution Date, the Class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata share of the Unsecured Dividend.

5.20.3 The Allowed Claim Is Impaired and is entitled to vote on the Plan

**5.21 Class 21 Unsecured Bricklayers Local No. 6 of Indiana Welfare Fund**

5.21.1 On the Initial Distribution Date, the Unsecured claim of the Chicago Area Joint Welfare Committee, Local 52 shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata shares of the Unsecured Dividend. The class filed a Proof of Claim showing an unsecured amount of $14,972.67.

5.21.2 The Class is impaired and is entitled to vote.

**5.22 Class 22 Unsecured Bricklayers Local No. 6 of Indiana Pension Fund**

5.22.1 On the Initial Distribution Date, the Unsecured claim Bricklayers Local No. 6 of Indiana Pension Fund shall receive, in full satisfaction, settlement and release and discharge of

its unsecured claim a pro-rata shares of the Unsecured Dividend. The class filed a Proof of Claim showing an unsecured amount of $19,221.44.

5.22.2 The Class is impaired and is entitled to vote.

**5.23 Class 23 Unsecured claim of the Bricklayers and Trowel Trades**

5.23.1 On the Initial Distribution Date, the Unsecured claim the Bricklayers and Trowel Trades shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata share of the Unsecured Dividend. The class filed a Proof of Claim showing an unsecured amount of $3,482.23

5.23.2 The Class is impaired and is entitled to vote.

**5.24 Class 24 Unsecured claim of the Bricklayers Union Local 4 of IN/KY**

5.24.1 On the Initial Distribution Date, the Unsecured claim of the Bricklayers Union Local 4 of IN/KY shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata shares of the Unsecured Dividend. The class filed a Proof of Claim showing an unsecured amount of $6,337.45.

5.24.2 The Class is impaired and is entitled to vote.

**5.25 Class 25 Unsecured International Masonry Institute**

5.25.1 On the Initial Distribution Date, the Unsecured claim of the International Masonry Institute shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata shares of the Unsecured Dividend. The class filed a Proof of Claim showing an unsecured amount of $981.57.

5.25.2 The Class is impaired and is entitled to vote.

**5.26 Class 26 Unsecured claim Local 21 Brick Layers**

5.26.1 On the Initial Distribution Date, the Unsecured claim of Local 21 Brick Layers shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata shares of the Unsecured Dividend. The class filed a Proof of Claim showing an unsecured amount of 20,567.00.

5.26.2 The Class is impaired and is entitled to vote.

**5.27 Class 27 Unsecured claim of Glico Scaffolding Co., LLC.**

5.27.1 The class consists of the Unsecured claim of Glico Scaffolding Co., LLC ("Gilco.") Gilco filed a Proof of Claim alleging that it has a secured claim of $122,117.21. The Debtor has objection to this claim and will be filing a Valuation Motion pursuant to § 506. Gilco is the holder

of a junior UCC security agreement. The Debtor's Assets are fully encumbered. Gilco's claim is subordinate and will be treated as unsecured for purpose of the plan provided the Property is valued according the Debtor's valuation. Pending a determination of the value of the Debtor's Property by the Court, Gilco will have an unsecured claim of $122,117.21.

5.27.2 On the Initial Distribution Date, the Class shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata share of the Unsecured Dividend.

5.27.3 The Allowed Claim Is Impaired and is entitled to vote on the Plan.

**5.28 Class 28 Unsecured Tax Claims IRS**

5.28.1 The Internal Revenue Service ("IRS") filed a Proof of Claim stating an unsecured balance of $81,389.64.

5.28.2 On the Initial Distribution Date, the IRS shall receive, in full satisfaction, settlement and release and discharge of its unsecured claim a pro-rata share of the Unsecured Dividend.

5.28.3 The Class is impaired and is entitled to vote.

**5.29 Class 29 Convenience Class**

5.29.1 The Debtor has Claims that in aggregate are less than $1,000 per claim and are minimal, and because the "paperwork" involved with Claims will be costly to administer over the life of the Plan, the Debtor proposes to pay the entire amount of these Claims on the Effective Date.

5.29.2 The Class is unimpaired and is not entitled to vote.

**5.30 Class 30 General Unsecured Claims**

5.30.1 The Class consists of Claims that are all the Claims against the Debtor that are neither secured nor entitled to priority. This class is inclusive of the unsecured claims of other Classes. This Class will be paid per the Unsecured Dividend. The total of class Claims is estimated at $573,974.69.

5.30.2 The Class is impaired and is entitled to vote.

**5.31 Class 31: Equity Security Holder.**

5.29.1 The 100% of the stock Interest of David Algozine and Joseph Algozine shall be cancelled on the Effective Date of the Plan. On the Effective Date the Equity Interest holder shall pay to the Reorganized Debtor the sum of Ten Thousand Dollars ($10,000.00.) This amount shall be the Debtor's New Value Contribution. The Source of the New Value Contribution will be from the Equity Interest Holders personal funds.

**ARTICLE VI**
**ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE Classes OR Equity Interest; CRAM DOWN**

**6.1 Classes Entitled to Vote**.

Except as provided in ¶ 6.3 below, each Impaired Class of Claims and Equity Interest that will receive distributions under the Plan shall be entitled to vote separately to accept or reject the Plan. Classes, 2,3, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, and 28 are impaired and entitled to vote.

**6.2 Deemed Acceptance without Vote**.

Any unimpaired class of Claims or Equity Interest shall be deemed to have accepted the Plan and shall not be entitled to vote to accept or reject the Plan. Classes 1,, 4, 5, 6, 7, 8, 9, and 27 are unimpaired, and is not entitled to vote.

**6.3 Deemed Rejection without Vote.**

Any Impaired Class of Claims or Equity Interest which will not receive a distribution under this Plan shall be deemed to have rejected the Plan and shall not be entitled to vote to accept or reject the Plan.

**6.4 Class Acceptance Requirement.**

An Impaired Class of Claims shall have accepted the Plan if accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.

**6.5 Cramdown.**

Notwithstanding the rejection or deemed rejection of the Plan by any Class of Claims or Equity Interests, the Debtor hereby requests that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

In the event any Impaired Class of Claims votes against the Plan, and the Plan is not revoked or withdrawn in accordance with Article 12.2, the Debtor request, and shall be Allowed, to modify the terms of the Plan to effect a "cramdown" on such dissenting Class by (a) restructuring the treatment of any Class on terms consistent with § 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting Distributions to all Classes at or below the level of the objecting Class, or reallocating such Distributions, until such impaired senior Classes are paid in accordance with the absolute priority rule of § 1129(b) of the Bankruptcy Code. The Debtor may make such modifications or amendments to the Plan and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in Interest entitled to receive notice before the Confirmation Hearing. No such modifications shall require any re-solicitation of acceptances as to

the Plan by any Class of Claims or Equity Interests unless the Bankruptcy Court shall require otherwise. Subject to any provision of the Plan to the contrary, the Debtor reserves any and all rights it may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims of the Holders of which have not accepted the Plan

## ARTICLE VII
## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

### 7.1 The New Value Contribution.

The Shareholders of the Debtor David Algozine and Joseph Algozine, or a third party on behalf of the equity Holders, will contribute a minimum of $10,000, for the issuance of new shareholder Interest in the Reorganized Debtor.

The New Value Contribution shall be made available on the Effective Date for distribution pursuant to the terms of the Plan. The New Value Contribution shall be used to fund, a portion of the priority payments.

### 7.2 New Value Auction.

In the event, there is a non-accepting class, them the New Value Contribution shall be subject to higher or better offers. The Debtor will publish a notice approved by the court for a new value auction in a newspaper published in the location of the Debtor, the terms of the auction will be subject to court approval later. If an entity offers more than the New Value Contribution for the purchase of the equity in the Reorganized Debtor, the Debtor shall conduct an auction for the sale of the equity in the Reorganized Debtor at the Confirmation Hearing. The highest and best offer at the auction shall constitute the New Value Contribution and the offeror shall constitute the new Interest holder(s) in the Reorganized Debtor.

If, in addition to the proposed contributions of David Algozine and Joseph Algozine pursuant to the terms of this Plan, at least one Qualified Bid for the New value has been received, the Debtor will proceed with the Equity Auction to be held at the confirmation hearing. As soon as practicable after the conclusion of the Auction, the Debtor, (a) shall review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummation of the transaction, (b) shall determine, in their business judgment, which Qualified Bid is the highest or otherwise best offer (the "Winning Bid"), and the bidder making the Winning Bid (the "Winning Bidder"), and (c) reject at any time before entry of the Confirmation Hearing, any bid that, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best Interests of the Debtor, its Estate and creditors (the "Bid Analysis"). After the Bid Analysis, the Debtor shall ask the Bankruptcy Court to enter an Order authorizing the Debtor to consummate the Sale of the Equity upon the terms of the Winning Bid, to the Winning Bidder, and to execute such additional documentation as is reasonably necessary to close such Sale upon the terms of the Winning Bid. Notwithstanding anything contained herein to the contrary, the sale of the Equity in the

Reorganized Debtor to any Winning Bidder is contingent upon the entry of an Order by the Bankruptcy Court confirming this Plan.

Notwithstanding anything to the contrary contained in this Plan, if David Algozine and Joseph Algozine are not the Winning Bidder, then (i David Algozine and Joseph Algozine shall not make the New Value Contribution to the Reorganized Debtor, (ii) the Equity Interests shall be cancelled and extinguished on the Effective Date.

Parties wishing to overbid the current offer of the New Value Contribution for the Equity Interests in the Reorganized Debtor must (i) provide a written offer to the Debtor on or before the Confirmation Hearing setting forth the offeror's name, contact information and amount of offer; (ii) prior to the Confirmation Hearing, submit a cashier's check in the amount of $10,000.00 payable to the Debtor ("Deposit") and provide evidence of ability to pay any additional amounts offered; (iii) make an offer in excess of the New Value Contribution; and (iv) be present at the Confirmation Hearing. Everything offers and submissions of Deposits must be made on or before the Confirmation Hearing and sent to Debtor's counsel: O. Allan Fridman, 555 Skokie Blvd. Suite 500, Northbrook, Il 60062.

**7.3 Funding the Plan.**

As described above, (a) Administrative Claims will be paid from the Debtor's future operations; (b) secured Classes will be paid from future earnings; (c) priority Classes will be paid from the funds on hand on the Effective Date; and (d) unsecured Classes from the Debtor's future operations. In addition, the New Value Contribution may be used to fund Plan payments.

**7.4 Operation of Business and Management of Assets after Effective Date**.

Except as otherwise specifically set forth in the Plan, as of the Effective Date, the Reorganized Debtor may operate the business of the Reorganized Debtor, and may use, acquire and dispose of any property, assets or rights free of any restrictions imposed by the Bankruptcy Code.

**7.5 Disbursements**.

David Algozine as Secretary of the Debtor shall act as Disbursing Agent and shall make all Distributions in accordance with the Plan. To make the Distributions under the Plan, the Reorganized Debtor, as Disbursing Agent, shall distribute all property and payments called for by the Plan.

**7.6 Reserve for Disputed Claims**.

On and after the Effective Date, the Distributions reserved for the Holders of Disputed Claims shall not be distributed but shall be held by the Reorganized Debtor in a segregated account (the "Disputed Claims Reserve") for the benefit of the Holders of the Disputed Claims entitled thereto under the Plan. Except to the extent that the Court shall have estimated under section 502(c) of the Code or otherwise determined that a good and sufficient reserve for Disputed Claims is less

than the full amount thereof, there will be deposited into the Disputed Claim Reserve an amount of cash which would have been distributed because all Disputed Claims if all Disputed Claims were Allowed in the full amount claimed by the holder thereof.

**7.7 Resolution of Disputed claim.**

When a Disputed claim becomes an Allowed Claim, the distribution which would have been disbursed had the Disputed claim been an Allowed Claim on the Effective Date shall be released from the Disputed Claims Reserve and delivered to the Disbursing Agent for delivery to the holder of such Allowed Claim within thirty (30) days. At such time as all Disputed Claims have been finally determined, the balance of the Disputed claim Reserve not theretofore distributed shall be returned to the Reorganized Debtor.

**7.8 Unclaimed Distributions.**

The Reorganized Debtor shall deposit any Unclaimed Distributions into an undivided Property Reserve to be held in trust for the benefit of the Holders of Allowed Claims entitled thereto under the terms of the Plan. For a period of one hundred eighty (180) days following the date of distribution, Unclaimed Property, including any principal, Interest and dividends, in cash or in kind, as may have been paid because any such Unclaimed Property shall be held in the Unclaimed Property Reserve solely for the benefit of the Holders of Allowed Claims which have failed to claim such property. Until the expiration of one hundred eighty (180) days following the distribution date, Unclaimed Property due to the holder of an Allowed Claim shall be released from the Unclaimed Property Reserve and delivered to such holder upon presentation of proper proof of such holder to its entitlement thereto. At the end of one hundred eighty (180) days following the distribution date, the holder of Allowed Claims theretofore entitled to Unclaimed Property shall cease to be entitled thereto, and the Unclaimed Property shall then become the property of the Reorganized Debtor.

**7.9 Execution and Delivery of Documents.**

The Debtor and Reorganized Debtor are authorized to execute and deliver documents and instruments as are necessary or appropriate to promote and implement Consummation of the Plan or to carry out the purposes of the Plan.

**7.10 Objections to Claims and Interests.**

Any objection to any claim or Interest shall be filed on or before thirty (30) days after the Effective Date. This time can be extended by the Court upon request of the Debtor or the Reorganized prior to Confirmation of the Plan, except for Administrative Claims. The deadline for filing Administrative Claims, including Claims for compensation and reimbursement of professional persons employed pursuant to Court Order in the Case, will be fixed by the Court.

**7.11 Retention and Enforcement of Claims.**

Pursuant to section 1123(b)(3) of the Code, the Reorganized Debtor may maintain and enforce any Claims of the Debtor or the Estate.

**7.12 Court and United States Trustee Fees.**

Prior to the Effective Date, all fees due from the Debtor to the Clerk of the Court and all fees due from the Debtor to the United States Trustee shall be paid in full.

**7.13 Post-Confirmation Reports and Fees.**

The Reorganized Debtor shall be responsible for the filing of all post-Confirmation reports required during such period with the U.S. Trustee and the payment of all Post-Confirmation fees charged or assessed against the bankruptcy Estate under 28 U.S.C. § 1930.

**7.14 No Interest to Accrue on Unsecured Claims.**

No post-petition Interest shall accrue or be payable on any General Unsecured claim against the Debtor. Interest shall only accrue on Secured Claims and Priority Pension Claims against the Debtor to the extent provided and Allowed under applicable law.

**7.15 Vesting of Assets.**

Pursuant to the provisions of Sections 1141(b) and 1141(c) of the Bankruptcy Code, all the Debtor's assets, including but not limited to all the property of this bankruptcy Estate pursuant to section 541 of the Bankruptcy Code, shall vest in the Reorganized Debtor, free and clear of all Claims, Liens, encumbrances, charges and other Interests of the Holders of Claims and Equity Interests, except as otherwise provided in the Plan. Upon the Effective Date, and conditioned upon the acceptance of the Plan by Class 29 hereunder, all the Debtor's Claims and Causes of Action under 11 U.S.C. §§ 547 shall be released and extinguished.

**7.16 Preservation of Debtor's Causes of Action.**

Except as provided in, and unless expressly waived, relinquished, exculpated, released, compromised or settled in this Plan, the Confirmation Order or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan: (a) the Debtor shall exclusively retain and may prosecute and enforce, and the Debtor expressly reserves and preserves for these purposes, in accordance with Sections 1123(a)(5)(B) and 1123(b)(3) of the Bankruptcy Code, any Claims, demands, rights and Causes of Action that the Debtor or its Estate may hold against any person or entity; (b) accordingly, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), claim splitting or laches shall apply to such reserved and preserved Claims and Causes of Action by virtue of or in connection with the Confirmation, consummation or effectiveness of the Plan; and (c) the Reorganized Debtor exclusively may pursue such reserved and preserved Claims, Causes of Action, demands and rights in the Debtor's name as appropriate, in accordance with the Debtor's best Interests.

**7.17 Setoffs.**

Except as otherwise provided for herein, the Reorganized Debtor may, but shall not be required to, set off against any claim and the payments to be made pursuant to this Plan in respect of such claim, claim(s) of any nature whatsoever the Debtor or its Estate may have against the holder of such claim, but neither the failure to do so nor the allowance of a claim hereunder shall constitute a waiver or release by the Debtor or its Estate of any claim it may have against such holder. Likewise, the Debtor shall reserve and preserve all of its rights of recoupment to the fullest extent possible.

## ARTICLE VIII
## POST-CONFIRMATION EMPLOYMENT AND COMPENSATION OF PROFESSIONALS

**8.1 Post-Confirmation Employment.**

After the Confirmation Date, the Reorganized Debtor may employ, without notice, hearing or Order of the Court, such attorneys, accountants and other professionals as it may desire to render services on such terms as it deems reasonable. With respect to services rendered by professional persons employed by the Reorganized Debtor after the Confirmation Date, the Reorganized Debtor shall be authorized to pay for such service, related costs and expenses without notice, hearing or Order of the Court; provided however, that with respect to fees, costs and expenses of such professional persons for services rendered after the Confirmation Date in or in connection with the Case, or in connection with the Plan and incident to the Case, in the event the Reorganized Debtor disputes the reasonableness of any such fees, costs or expenses, the Reorganized Debtor shall pay such professional person only the undisputed amount, if any, and file an application with the Court to determine the reasonableness of the fees, costs or expenses which are in dispute.

## ARTICLE IX
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**9.1** All executory contracts and unexpired leases of the Debtor entered before the Petition Date and not rejected pursuant to Section 365 of the Bankruptcy Code before the Confirmation Date shall be deemed assumed upon the Confirmation Date.

## ARTICLE X
## DISCHARGE OF Claims AND INTERESTS AND RELEASE

**10.1 Satisfaction of Claims**.

Except as expressly provided in the Plan or the Confirmation Order, all Claims against Debtor, except to the extent of valid Claims against co-obligors, shall be satisfied by the distributions or treatments received under this Plan. Further, except as expressly provided in the Plan or the Confirmation Order, all Holders shall be precluded from asserting against the Reorganized Debtor, or its assets, or, any further Claim based on any act, omission, transaction or activity of any kind or nature that occurred before the Confirmation Date, whether or not such holder filed a Proof of Claim in this Case.

**10.2 Discharge of Interests.**

Except as provided for in the Plan, all Holders of Interests shall be precluded from asserting against the Reorganized Debtor, or its assets, on account of such Interests, any further right, title or Interest based on any act, omission, transaction or activity of any kind or nature that occurred before the Effective Date, whether or not such holder filed a proof of Interest in Case.

**10.3 Injunction.**

As of the Effective Date, all entities that have held, currently hold or may hold a claim against the Debtor are permanently enjoined from taking any of the following actions on account of any such claim against the Reorganized Debtor except as provided in the Plan or the Confirmation Order: (i) commencing or continuing in any manner any actions or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or Order; (iii) creating, perfecting or enforcing any lien or encumbrance; and (iv) asserting a setoff, right of subrogation or recoupment of any kind against any Debt, liability or obligation.

**10.4 Waiver of Claims against Plan Distributions.**

Except as provided in the Plan, as of the Effective Date of the Plan, each Creditor, by virtue of the Final Order confirming the Plan, waives and relinquishes any and all rights with respect to distributions made or to be made under the Plan to any other Creditor on account of Claims against the Debtor.

## ARTICLE XI
## RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

**11.1 Court Jurisdiction.**

From the Confirmation Date until entry of a final decree closing the Debtor's Bankruptcy Case (pursuant to 11 U.S.C. § 350 and Bankruptcy Rule 3022), the Bankruptcy Court shall retain such jurisdiction as is legally permissible over this case (and all contested matters and adversary proceedings arising therein or relating thereto) for the following purposes: to hear and determine

(i) any and all objections to the allowance of any claim or Administrative claim,

(ii) any controversy as to the validity, priority, or classification of any claim or Administrative claim, or

(iii) any matters which may directly, indirectly or contingently affect the obligations of the Debtor to any creditors, Holders of Claims or other parties in Interest; to hear and determine any and all applications for compensation and reimbursement of expenses by professionals employed for the benefit of the bankruptcy Estate; to hear and determine (i) any and all pending motions for the assumption, rejection and/or assignment of executory contracts and unexpired leases, (ii) any disputes relating thereto or arising therefrom and (iii) to determine the amount and treatment of any Claims arising therefrom; to adjudicate such contested matters and adversary proceedings as may be pending or subsequently initiated in the Bankruptcy Court, including, but not limited to,

Claims and Causes of Action belonging to the Debtor and actions relating to taxes brought by the Reorganized Debtor; to enforce and interpret the provisions of this Plan and the Confirmation Order; to issue any injunction or other relief appropriate to implement the intent of the Plan, and to enter such further orders as may be required to enforce any injunctions or other relief issued under the Plan or pursuant to the Confirmation Order; to modify the Plan pursuant to section 1127 of the Bankruptcy Code and the applicable Bankruptcy Rules; to correct any defect, cure any omission, or reconcile any inconsistency in this Plan or in the Confirmation Order as may be necessary to carry out the purpose and intent of this Plan; to interpret and determine such other matters as the Confirmation Order may provide for, or as may be authorized under the Bankruptcy Code; to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated; and to enter an Order concluding and terminating this case.

## ARTICLE XII
## MODIFICATION AND WITHDRAWAL OF PLAN

### 12.1 Modification of Plan.

The Debtor may propose modifications to this Plan at any time before Confirmation, if the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and that the Debtor has complied with the section 1125 of the Bankruptcy Code (to the extent applicable to such modifications). The Debtor may propose modifications to this Plan at any time after Confirmation and before its substantial consummation; provided, however, that (i) the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and (ii) the Bankruptcy Court determines, after notice and a hearing, that (A) the Plan, as modified complies with section 1129 of the Bankruptcy Code and (B) the circumstances warrant such modification.

### 12.2 Withdrawal of Plan.

The Debtor reserves the right to withdraw and/or revoke the Plan at any time prior to the entry of the Confirmation Order. If the Debtor withdraws and/or revokes the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void. In that event, nothing contained shall be deemed (a) to constitute a waiver or release of any Claims by the Debtor, or any other person, (b) to prejudice in any manner the rights of the Debtor, or any other person, or (c) to constitute an admission by the Debtor any other person.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

### 13.1 Headings.

Headings are utilized in this Plan for the convenience of reference only, and shall not constitute a part of this Plan for any other purpose.

### 13.2 Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Illinois applicable to contracts executed in such State by residents thereof and to be performed entirely within such State will govern the construction and implementation of this Plan, and any agreements, documents, and instruments executed in connection with this Plan.

**13.3 Binding Effect.**

As of the Effective Date, the Plan shall be binding upon and inure to the benefit of the Reorganized Debtor, the Holders of Claims, the Holders of Equity Interests and their respective successors and assigns.

**13.4 Notices.**

All notices to the Debtor in connection with the Plan shall be in writing, and shall be deemed received upon actual delivery by messenger, facsimile, email or delivery by a national overnight courier to the following address:

O. Allan Fridman
555 Skokie Blvd. Suite 500; Northbrook, Illinois 60062
Tel 847-412-0788; Fax 847-412-0898 email :allan@fridlg.com

**13.5 Successors and Assigns.**

The rights and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of the successors and assigns of such entity.

**13.6 Severability.**

Wherever possible, each provision of the Plan shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any provision of the Plan shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Plan. Confirmation of the Plan shall constitute a determination by the Bankruptcy Court that there is no provision contained therein that is prohibited or invalid under applicable law. Furthermore, if the Bankruptcy Court will not confirm the Plan because one or more provisions hereof are determined to be prohibited or invalid under applicable law, the Debtor may seek permission of the Bankruptcy Court to amend the Plan by deleting or modifying the offending provision.

Dated: January 8, 2021.

Respectfully submitted,
Algozine Masonry Restoration, Inc.
By: /s/ O. Allan Fridman
One of Its Attorneys

O. Allan Fridman
555 Skokie Blvd. Suite 500
Northbrook, Illinois 60062
Tel: 847-412-0788 Fax 847-412-0898 [allan@fridlg.com]

**Exhibit C: Discharged order David Algozine dated January 29, 2019.**

**Information to identify the case:**

| | | | |
|---|---|---|---|
| Debtor 1 | **David Allen Algozine**<br>First Name Middle Name Last Name | Social Security number or ITIN | **xxx−xx−3545** |
| | | EIN | _ _−_ _ _ _ _ _ _ |
| Debtor 2<br>(Spouse, if filing) | First Name Middle Name Last Name | Social Security number or ITIN | _ _ _ _ |
| | | EIN | _ _−_ _ _ _ _ _ _ |
| United States Bankruptcy Court | **Northern District of Indiana** | | |
| Case number: | **18−20533−jra** | | |

# Order of Discharge

**12/15**

**IT IS ORDERED:** A discharge under 11 U.S.C. § 727 is granted to:

David Allen Algozine

1/29/19

**By the court:** James R. Ahler
United States Bankruptcy Judge

## Explanation of Bankruptcy Discharge in a Chapter 7 Case

This order does not close or dismiss the case, and it does not determine how much money, if any, the trustee will pay creditors.

### Creditors cannot collect discharged debts

This order means that no one may make any attempt to collect a discharged debt from the debtors personally. For example, creditors cannot sue, garnish wages, assert a deficiency, or otherwise try to collect from the debtors personally on discharged debts. Creditors cannot contact the debtors by mail, phone, or otherwise in any attempt to collect the debt personally. Creditors who violate this order can be required to pay debtors damages and attorney's fees.

However, a creditor with a lien may enforce a claim against the debtors' property subject to that lien unless the lien was avoided or eliminated. For example, a creditor may have the right to foreclose a home mortgage or repossess an automobile.

This order does not prevent debtors from paying any debt voluntarily or from paying reaffirmed debts according to the reaffirmation agreement. 11 U.S.C. § 524(c), (f).

### Most debts are discharged

Most debts are covered by the discharge, but not all. Generally, a discharge removes the debtors' personal liability for debts owed before the debtors' bankruptcy case was filed.

Also, if this case began under a different chapter of the Bankruptcy Code and was later converted to chapter 7, debts owed before the conversion are discharged.

In a case involving community property: Special rules protect certain community property owned by the debtor's spouse, even if that spouse did not file a bankruptcy case.

**For more information, see page 2 >**

**Some debts are not discharged**
Examples of debts that are not discharged are:

- debts that are domestic support obligations;
- debts for most student loans;
- debts for most taxes;
- debts that the bankruptcy court has decided or will decide are not discharged in this bankruptcy case;
- debts for most fines, penalties, forfeitures, or criminal restitution obligations;
- some debts which the debtors did not properly list;
- debts for certain types of loans owed to pension, profit sharing, stock bonus, or retirement plans; and
- debts for death or personal injury caused by operating a vehicle while intoxicated.

Also, debts covered by a valid reaffirmation agreement are not discharged.

In addition, this discharge does not stop creditors from collecting from anyone else who is also liable on the debt, such as an insurance company or a person who cosigned or guaranteed a loan.

**This information is only a general summary of the bankruptcy discharge; some exceptions exist. Because the law is complicated, you should consult an attorney to determine the exact effect of the discharge in this case.**

**Exhibit D:** Order Confirming Chapter 11 Plan entered December 15, 2021, in *In re Algozine Masonry Restoration, Inc.*, Case No. 16-23208-JRA

ch 11 conf order.wpd

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Algozine Masonry Restoration, Inc. | ) | CASE NO. 16-23208 JRA |
| | ) | Chapter 11 |
| Debtor, | ) | |

ORDER CONFIRMING CHAPTER 11 PLAN

This case came on for final hearing on December 15, 2021 date pursuant to 11 U.S.C. §1128(a) and Fed.R.Bankr.P. 3020(b)(2) on the application by the Debtors for Confirmation of the Debtor's Second amended Plan filed by the Debtor on July 16, 2021..

The record shows service of notice of hearing on all creditors, equity security holders and parties in interest pursuant to Certificate of Service filed by Debtor on September 23, 2021.

An objection to confirmation of Second amended plan was filed by IRS, United States Trustee and Administrative District Council 1 of Illinois of the International Union of Bricklayers and Allied Craftworkers. The # 534 (Administrative District Council 1 of Illinois of the International Union of Bricklayers and Allied Craftworkers and #535 (IRS) objections have been resolved by an Agreed Immaterial Modification of Chapter 11 Plan and Order filed on December 14, 2021. The United States Trustee withdrew their Objection on December 15, 2021.

Debtors files ballots and tabulation of ballots as to acceptances or rejections of plan pursuant to §1126, Fed.R.Bankr.P. 3018 and N.D.Ind.L.B.R. B-2023(e).

Submitted.

The Court finds that the Second amended Plan, as modified by the modifications, satisfies all applicable requirements of Title 11 and should be confirmed.

IT IS THEREFORE ORDERED, that said Second amended Plan, should be and is hereby confirmed.

IT IS FURTHER ORDERED, that the Court shall retain jurisdiction until this Second

amended Plan has been fully administered, including, but not limited to, for the following purposes:

1. The classification of the claim of any creditor and the re-examination of claims which have been allowed for purposes of voting and the determination of such objections as may be filed to the creditors' claims;

2. The determination of all questions and disputes regarding title to the assets of the estate and the determination of all causes of action, controversies, disputes or conflicts, whether or not subject to action pending as of the date of the confirmation between the debtors and any other party, including but not limited to any right of the debtors to recover assets pursuant to the provisions of Title 11 of the United States Code;

3. The correction of any defect, the curing of any omissions, the reconciliation of any inconsistency in this Second amended Plan or the Order of Confirmation, as may be necessary to carry out the purposes and intent of this Second amended Plan;

4. The modification of this Second amended Plan after confirmation pursuant to the Bankruptcy Rules and Title 11 of the United States Code;

5. The enforcement and interpretation of the terms and conditions of this Second amended Plan;

6. The entry of any order necessary to maintain, lease, transfer, or in any way affect property which the debtor has the power and authority over pursuant to the terms of this Second amended Plan.

7. The entry of any order concluding and terminating this case.

The Clerk shall promptly mail a copy of this Order to the Debtors, Creditors, Equity Security Holders, the U.S. Trustee, and other parties in interest pursuant to Fed.R.Bankr.P. 3020(c) and Fed.R.Bankr.P. 2002(f).

Dated at Hammond, Indiana on December 15, 2021.

/s/ James R. Ahler
James R. Ahler, Judge
United States Bankruptcy Court

Distribution:
Debtors, Attorney for Debtors, U.S. Trustee
All Creditors, All equity security holders
Chairman and Attorney for Creditor's Committee (if applicable)

**Exhibit E:** November 13, 2023 order dismissing the Chapter 11 case

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| Algozine Masonry Restoration, Inc. | ) | Case No. 16-23208 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**ORDER GRANTING**
**MOTION TO DISMISS**

This matter coming before the Court on the Motion to Dismiss Filed by Creditors Chicago Area Joint Welfare Committee for the Pointing, Cleaning and Caulking Industry, Local 52, Tuckpointers Local 52 Defined Contribution Annuity Trust Fund and Tuckpointers Local 52 Pension Plan ("Creditors") DKT 637; the Court having reviewed the Motion and all related pleadings, and having heard the statements of counsel regarding the relief requested in the Motion at the pre-hearing conference;

IT IS HEREBY ORDERED THAT:

1. The Motion for Final Decree DKT 635 is hereby withdrawn.
2. The Motion to Dismiss is granted and the above captioned case is dismissed.
3. The Chapter 11 Case is hereby closed.

Date: Nov. 13, 2023

ENTERED: James R. Ahler

Order Prepared:

O. Allan Fridman
555 Skokie Blvd Suite 500
Northbrook, IL 60062
847-412-0788
Attorney Code 6274954
allan@fridlg.com